HOPE, INC., an Illinois not-for-profit corporation, et al., Plaintiffs-Appellees,

v.

The COUNTY OF DuPAGE, ILLINOIS, et al., Defendants-Appellants.

No. 82–1215.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1982.

Decided Sept. 9, 1983.

As Amended Sept. 12 and Oct. 14, 1983.

Rehearing En Banc Granted Oct. 24, 1983.*

* Opinion of Sept. 9, 1983, vacated.

Don H. Reuben, Reuben & Proctor, Chicago, Ill., for defendants-appellants.

Julie H. Friedman, Krupp & Miller, R. Dickey Hamilton, Chicago, Ill., for plaintiffs-appellees.

Before CUDAHY and COFFEY, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

In March, 1971, ten individual plaintiffs, some of whom resided in DuPage County, Illinois, and others who lived in the Chicago metropolitan area, and HOPE, Inc., a DuPage County based not-for-profit fair housing organization, filed suit against DuPage County, the members of its County Board and certain landowners and land developers in DuPage County claiming deprivation of rights protected by the Thirteenth and Fourteenth Amendments of the Constitu-

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

tion and 42 U.S.C. §§ 1981–1983, 1985(3) and 2000d. Jurisdiction was based on 28 U.S.C. §§ 1331 and 1343.

The second amended complaint, filed in September 1972, alleged that DuPage County and large land developers had engaged in a practice of exclusionary housing whereby all new housing units in the County were built for and sold or rented to the relatively wealthy. The net result of the County's alleged use of its state-delegated housing regulatory policy and the contractor's construction policy was that poor and black persons were denied the opportunity of housing in DuPage County. This denial of housing resulted in the perpetuation and increase of racial and economic segregation in the Chicago metropolitan area. It was alleged that those housing practices were intentionally discriminatory and that there was a conspiracy among the defendants to deprive the plaintiffs of their constitutional rights. HOPE, Inc. alleged that it represents those persons whose rights were violated.

It is the contention of the plaintiffs throughout this litigation that DuPage County used its power to regulate land use in a manner which benefited only the wealthy. It is contended that the County's zoning ordinance unreasonably increased the cost of all housing, thus affecting the development of low and moderate income housing, and that this prevented the housing of blacks and other minorities.

Under the County Zoning Ordinance, multi-family housing is permitted in the B–4 commercial classification without a special permit. District Opinion at 40. Multiple family housing units can be built as a special use in R–3 residential districts, but there is a minimum gross area requirement of five acres. *Id.* The requirement of a special use permit has no rules or standards governing the determination of the permit. The plaintiffs contend this unfettered discretion by the County results in the developers tailoring their multi-family developments in such a manner as they believe the County would approve. The plaintiffs contend that public statements of County officials and the questions and the statements of County officials at zoning hearings evidenced a discriminatory attitude toward low and moderate income persons and such statements in turn influenced land developers.

*Participants*

DuPage County is due west of the City of Chicago and is governed by an elected twenty-five member Board of Supervisors ("County Board"). Illinois law authorizes the County to enact zoning ordinances regulating land use in the unincorporated areas of the County. Ill.Rev.Stat. ch. 34, §§ 3151–3162 (1982). Approximately 40% of the total area of the County is unincorporated and subject to the County Zoning Ordinance. Opinion at 30.

The District Court found that:

DuPage County, measured by per capita income, is the fourth richest county in the United States. It has the lowest percentage of inexpensive housing, both owner-occupied and rental, of any county in the eight county Chicago Metropolitan area. In 1970, of all the counties in the United States, DuPage had the lowest percentage of its population living at or below the poverty level.

DuPage County is also predominantly white. In 1970, there were 1,276 black persons residing in DuPage County households, representing 0.26% of the total household population of the county.

\* \* \* \* \* \*

DuPage County's population in the two decades 1950–1970 grew from 150,052 to 485,181, an increase of 223%, the largest of any of the eight counties in the Chicago Metropolitan area.... While the population increase in the other counties of the Chicago Metropolitan Area has resulted primarily from natural growth, DuPage County is uniquely the recipient of white persons migrating from Chicago.

\* \* \* \* \* \*

[D]uring the period 1964–1970, jobs increased from 56,973 to 108,819, or 91%, but 30.2% of those working in DuPage

County in 1970 lived outside the County, the highest in any of the six Illinois counties in the Chicago Metropolitan area. *Id.* at 24–27.

The County Board, in the exercise of its delegated powers, has created several committees, one of which is the Zoning Committee. In addition, there is a Zoning Board of Appeals ("Zoning Board") consisting of seven members appointed by the County Board Chairman and approved by the Board to serve for five year terms. The Zoning Board hears all requests for zoning changes, variations and special uses. The Zoning Board's recommendation, together with the file and transcript of any hearings, are sent to the Zoning Committee for its recommendation. After this Committee's review and recommendation, the County Board takes final action upon the request.

> The Zoning Committee and County Board customarily ratify the Zoning Board recommendations and the County Board usually incorporates verbatim the letter of the Zoning Board in the ordinance which it enacts. It is clear, therefore, that the factors and criteria utilized by the Zoning Board have been and are accepted and approved by the County Board in virtually all cases.

*Id.* at 31–32.

In 1942, the County Board authorized the creation of the DuPage County Housing Authority. The Housing Authority, composed of five members appointed by the Chairman of the County Board, has a staff of two—a director and an administrative assistant. The Housing Authority has the authority to plan, construct, operate and seek federal and state funds for the developing of housing projects for persons who lack the income necessary to enable them to live in available decent, safe and sanitary dwellings without over-crowding. Since its creation in 1942, the Housing Authority has not constructed any multiple-family housing projects in DuPage County. The district court found the Housing Authority "... enjoys the distinction of having done

less for fewer people over a longer period of time than any other such authority." *Id.* at 69.

The plaintiffs include HOPE, Inc. and ten individuals authorized by an order, entered September 21, 1972, to maintain this action as representatives of a class of persons whose income levels were sufficiently low to make them eligible for publicly assisted housing under the 1934 Illinois Housing Authorities Act, Ill.Rev.Stat., ch. 67½, ¶ 1, *et seq.* (1971), or for federally subsidized housing under 12 U.S.C. §§ 1715*l*(d)(3), 1715z and 1715z–1.

HOPE, Inc. is an Illinois not-for-profit corporation whose purposes are described in its Articles of Incorporation as:

> (1) To promote social situations which foster the health and welfare of the poor and underprivileged and in furtherance of this purpose, the corporation shall have the power to acquire improved residential property in order to make the same available for use as dwelling places for those families or individuals unable to obtain adequate housing due to financial hardship;

*Id.* at 36.

HOPE's purpose has been to promote adequate housing for persons with low and moderate incomes. Until 1975, HOPE provided the only low rent housing available in DuPage County. HOPE maintains a list of the relatively few federally subsidized units in DuPage County for moderate or low income families and refers families to any available units.

Each of the individual plaintiffs, prior to the time of filing this lawsuit, had contacted HOPE for assistance in finding adequate housing in DuPage County. Through HOPE, several of the plaintiffs have found adequate housing while the others were, as of October 1, 1981, the date of the District Opinion, still seeking adequate housing. All plaintiffs, except one, are or were residents of DuPage County.[1]

---

1. *See Planning for People Coalition, et al. v. County of DuPage, Illinois, et al.,* 70 F.R.D. 38

(N.D.Ill.1976) at 40 n. 1 for a more complete

*The Procedural Record*

By agreement of the parties, the district court, in July 1976, ordered the parties to exchange proposed stipulations of facts and evidence which would facilitate a prompt presentation of the evidence and a substantially agreed upon record. Pursuant to that order, the parties in April 1977 filed Stipulations of Evidence consisting of eight volumes, or approximately 2800 pages of stipulated facts, allegations deemed admitted, interrogatories and answers, depositions and statements of facts to which witnesses, if called upon, would testify. After this filing, the parties filed Statements of Objections to the evidence and the parties cross-examined by deposition those persons whose testimony was introduced by written statement into the record. The parties then filed Supplemental Stipulations of Evidence, Volumes I through VIII and Second Supplemental Stipulations of Evidence filed August 1979. The district court conducted hearings on October 31, November 1, 6, 7, 1978, during which the parties cross-examined an agreed upon number of called witnesses. During this time, the district court sought an amicable, negotiated disposition of the controversy through the conciliation services of the Community Relations Service of the Department of Justice and through the court's own efforts. In December 1980, it was concluded that no negotiated disposition was possible.

On October 1, 1981, Senior District Judge Hubert Will concluded in his Findings of Facts, Conclusions of Law and Opinion that the County defendants (DuPage County and the members of the DuPage County Board) had knowingly and intentionally pursued housing policies and practices intended to and effectively having excluded persons of low and moderate income and racial minorities from residing in the County. The district court found no conspiracy by developers and the County. It was concluded that the plaintiffs and members of the plaintiff class had suffered and continue to suffer irreparable harm from these County policies and practices.

On February 3, 1982, the district court entered its Judgment and Decree. The Decree enjoined the enforcement of provisions of the DuPage County Zoning Ordinance governing lot size, minimum acreage, parking, setback, side yard width, front yard depth, minimum areas for trailer parks and density with respect to low and moderate income housing projects. Decree ¶ (A)–(B). Special use permits for planned developments and multi-family dwellings for low or moderate income housing will not be required. *Id.* ¶ (C). The County was prohibited from examining zoning applicants regarding prices that would be charged for the housing or the projected value of or estimated tax revenue to be realized from a residential development. *Id.* ¶.(D). Within ninety (90) days of the Decree, the County, in consultation with HOPE, Inc., was ordered to develop a ten-year plan to significantly increase the number of housing units for low and moderate income families. If the parties could not agree upon a plan, the court would assist in resolving the question. *Id.* ¶ (E). The court additionally required quarterly reports to March 1992 both from the County and from HOPE, Inc. upon the implementation of the decree. *Id.* ¶ 3. The court specifically found that:

> [i]t is the purpose of this decree to assure that a meaningful amount of housing for families with low and moderate incomes is actually developed in DuPage County and that, at a minimum, the amount of new housing for families with low and moderate incomes equal the goals that the County has purportedly set in various Housing Assistance Plans filed with the United States Department of Housing and Urban Development.

*Id.* ¶ 4. Defendants' motions for stays of this decree were denied by the district court and this Court of Appeals.

*District Court's Findings Regarding DuPage Land Development and Planning Policy*

The district court, following the Supreme Court approach in *Village of Arlington*

---

financial, social description of the individual plaintiffs.

*Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), examined a number of sources of information in order to determine what was the policy and purposes of the County in its land development and planning policy. The court considered statements of public officials, reports of publications, actual decisions of County agencies, as well as reasonable inferences which can be drawn from all the factors. The court also found relevant what persons, such as land developers who dealt with the County Committees, understood the applicable policy to be.

. The district court considered:

1. Statements made in 1971 by James H. Clark, Collector and Treasurer of DuPage County, which appeared in the *Chicago Tribune.* Mr. Clark, collaborating with Casey Banas, editor of the Perspectives section of the Tribune, wrote an article entitled "Suburbia High Taxes, the Dream Becomes a Nightmare" in which the following statement was made:

> Another new issue in the suburbs is housing for low income people. Low income housing in DuPage County is like buying a case of cancer. It would result in too many people with too little tax revenue to pay for the services—again primarily schools—needed by these people.

Opinion at 44. In an earlier Tribune article, Mr. Clark was quoted as saying: "DuPage County cannot afford low and moderate income housing. To invite such housing into the county is as foolish as 'trying to buy cancer.'" *Id.* The Clark-Banas article was reproduced and 40,000 copies were distributed. Mr. Clark in his own deposition indicated that similar statements were made hundreds of times to the people of DuPage County. Stip. of Evid. ¶ 530, p. 1090. While Mr. Clark was the Treasurer of DuPage County and not on the Zoning Committee or Board, he did make direct recommendations to the Zoning Board. He

opposed a variation in the zoning for a development which would have included three-bedroom apartments.[2] After the three-bedroom units were withdrawn, Clark wrote a letter to the Chairman of the Zoning Board recommending approval. Included in his letter was a copy of the Clark-Banas article. In his letter of recommendation, Mr. Clark wrote:

> The property I am referring to is the last one of the remaining open spaces that can be used to generate the large tax asset without the influx of a great number of children.

*Id.* at 47. The application, as revised, was approved by the Zoning Board.

2. Gerald R. Weeks, a member of the County Board from 1963 and selected Chairman in 1970, was quoted in the March 31, 1971 edition of the local supplement of the *Chicago Tribune* responding to the NAACP's announcement of its plans to construct an integrated city of low and moderate income housing in DuPage County. Mr. Weeks was quoted as saying:

> . . . [T]he NAACP housing will be welcome if it conforms to the county's zoning laws. But, he said, the housing will not be welcome 'if they want us to lift the laws so they can build fire traps and slums.'

The article further reported:

> Weeks said the County Board is elected by the people and usually responds to the wishes and demands of the people. He said all planned-unit developments require zoning changes of the type that by the law must be preceded by public hearings.

Stip. of Evid. ¶ 60(6)–(I), pp. 187–89.

3. Fred Koebeman, a member of the County Board and Zoning Committee, "was asked at a public hearing whether he favored the proposed NAACP project and [he] replied flatly 'no'." Opinion at 49. The NAACP project was never submitted to the County.

**2.** During the hearings in October and November 1978, several witnesses indicated the presumption of several DuPage County Board members that three-bedroom apartments generally attracted persons with school-aged children who would burden the DuPage school systems.

4. In January 1970, the City Council of the City of Wheaton in DuPage County requested the cooperation of the DuPage County Housing Authority in the development of a public housing project in Wheaton to be constructed with the financial assistance of the Department of Housing and Urban Development (HUD). On March 5, 1971, the Executive Committee of the DuPage County Board, headed by Mr. Clive Gleason, met with the Wheaton City Manager, the City Attorney and the Wheaton Director of Building and Planning to discuss the Wheaton application for HUD funds. The Executive Committee requested that the Wheaton application be divided into two parts, one part requesting housing for the elderly and the second requesting low income family housing. Mr. Gleason stated that there was no problem regarding the housing for the elderly, but they did not want housing for low income families. Stip. of Evid. ¶ 701, p. 1292; Opinion at 54. The Executive Committee told the Wheaton officials that the County Board members and their constituents would oppose low income family housing. *Id.* The Wheaton proposal then became an issue in the spring 1971 elections for the Wheaton City Council. In that election, a slate of candidates who opposed the proposal was elected and, subsequently, authority to apply for HUD funds was revoked by the Wheaton City Council.

5. The district court also examined various questions asked and public statements made by members of the Zoning Board and Zoning Committee to discern the intent and the purpose of the County land development policy. It was admitted by the County planning director that there was no written or published criterion to be applied to applications for zoning changes for multi-family construction. Accordingly, the court found that the only evidence of a zoning criteria could be found in the statements and actions of the Zoning Board members and the planning director.

The plaintiffs examined the DuPage County zoning files from June 1963 to April 1976 with respect to residential developments with ten or more housing units. This study revealed that: (1) the question of what amount of taxes a development would generate was discussed in 65% of the zoning files; (2) the effect of a development upon nearby property value was discussed in 88% of the zoning files; and (3) no file contained reference to the racial composition of the proposed residents. Opinion at 56.

### a. Effect upon Schools

The district court found that the effect of a development upon school costs and budgets was a prime concern of the County Board. Developers, to satisfy the school boards and the Zoning Board, offered substantial donations to the school boards or restricted the number of units with three or more bedrooms, thus limiting the number of children in a development. One applicant indicated, in response to an inquiry from the Zoning Board, that he would limit family sizes in his project by confining sales to those persons 52 years or older. *Id.* at 59.

### b. Effect upon Neighboring Property

All parties agree that the prices of housing units, either rental or for sale units, should not be considered in zoning variation or special use applications, yet 84% of the files examined contain a statement of unit price. Frequently, the unit price information was elicited by a Zoning Board member. The district court found several reasons why price was a concern. First was the concern over school costs. Higher priced housing brought in high income, older residents with fewer children while lower priced units brought lower income, young people who had more children. *Id.* at 62. The court found, additionally, the notion that higher priced housing attracted higher class residents.

It is the plaintiffs' contention that Board members references to: "higher grade of people," "[p]eople that you don't have to worry about having so many services for," "I can think of a lot of people, . . . that I wouldn't want living out here," and "the type of people that would live in this place," are thinly veiled references to race.

6. In 1976, there were approximately 11,500 families classified as low or very low

income and an additional 25,000 families classified by HUD as "lower-income" households. But there are a negligible number of housing units for low and moderate income families in DuPage. The majority of those that do exist are limited to senior citizens. *Id.* at 68–69.

In 1978, during the pendency of this action, the County Board reversed a prior vote and rejected $710,000 in HUD Block Grant funds for a Glendale Heights project. The original proposal had called for housing for the elderly, but this had been changed to include a modest eight family-housing unit which was opposed by the County Board. Ruth Kretchmer, a member of the County Board, appeared at a Glendale Heights public meeting and indicated that the County Board would approve the project only if there was "overwhelming" support from the community for the proposal. The Glendale Heights project was never resubmitted for consideration.

7. The district court considered the following statistical information regarding cost of housing and the racial balance in the County of DuPage and the unincorporated areas of DuPage County as of 1970.

| | Whole County | Unincorporated |
|---|---|---|
| Rental units – | | |
| Less than $100 per month | 8.7% | 1.8% |
| $100–$150 per month | 25.8% | 7.3% |
| $150–$200 per month | 42.9% | 40.2% |
| Greater than $200 | 22.6% | 49.7% |
| Racial Ratio – | .336% | .007% |
| Black in rental units | .067% | 0% |
| Black in owner occupied | .15% | .02% |

*Id.* at 75–76 and Pl.Ex. 258, 255, 256, 257, Supp.Stip. of Evid. Vol. VI, pp. 104–111.

These factors were considered by the district court under the *Arlington Heights* criterion [429 U.S. at 266 to 268, 97 S.Ct. at 563 to 565] of:

(1) whether the impact bears more heavily on one race than another,

(2) whether a clear pattern, unexplainable on grounds other than race, emerges,

(3) whether the historical background reveals a series of official actions taken for invidious purposes,

(4) whether there are departures from the formal procedural or substantive criteria, particularly if factors usually considered important by the decision makers are contrary to those currently applied, and

(5) any legislative or administrative history.

*Id.* at 43.

It was the district court's conclusion that DuPage County zoning practices effectively excluded non-white residents. The court found the County's pattern of preventing moderate and low income families from being residents coincided with its objective of excluding non-whites. It was the district court's finding that there was a series of official acts which had invidious purposes, in particular: the official reaction to the Wheaton project; the failure of the Housing Authority, appointed by the County Chairman, to embark upon any new public integrated housing; statements made by Council officials; and Zoning Board and County Board decisions on variance applications which reflected a policy to prevent low-moderate income or non-white families living in DuPage. It was found that while there was no established criteria for zoning variances or special use permits, there was no procedural variation in applications. The court finally concluded that the legislative and administrative history reflected that DuPage County desired to exclude certain types of people. The court found that the DuPage County zoning ordinances do not serve a legitimate state interest which justifies any incidental discriminatory impact. In fact, their impact far outweighed any legitimate state interest which they might have served.

The summary conclusion found that DuPage County and its Board knowingly and intentionally, through housing policies and practices, excluded racial and low-moderate income minorities from living in the County.

## Issues on Appeal

The County of DuPage argues that the district court erred in failing to dismiss this

action for lack of standing and "case or controversy." Secondly, the County contends the plaintiffs have failed to establish that any constitutional rights were violated. Finally, it is argued that the Judgment and Decree of the district court was unrelated to the violations found and the effect of the Decree was a usurpation of local government authority.

## I

Initially, it should be noted that the defendants argue that the standard of review for this Court should not be the "clearly erroneous" standard of Fed.R.Civ.P. 52(a) because the district court tried this case on "cold stipulation" and no deference should be paid to its credibility determinations. *Fargo Glass & Paint Co. v. Globe American Corp.,* 201 F.2d 534, 536 (7th Cir.), *cert. denied,* 345 U.S. 942, 73 S.Ct. 833, 97 L.Ed. 1368 (1953); *Himmel Bros. Co. v. Serrick Corporation,* 122 F.2d 740, 742 (7th Cir. 1941). This was not, however, entirely a "paper case." While both parties exchanged voluminous volumes of stipulations, written testimony and objections, the district court also heard 3½ days of cross-examination of witnesses. After years of personal contact with the parties, reviewing the evidence and hearing the testimony, Judge Will prepared his own Findings and Opinion in addition to adopting the proposed Findings of the plaintiffs 464 through 559. Opinion at 65.

■ We are mindful of the definition of "clearly erroneous" as given by the Supreme Court in *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948).

A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with *the definite and firm conviction* that a mistake has been committed.

(Emphasis added). This was only recently reaffirmed in *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). We refuse "to go be-

hind the findings of the trial judge" and we retain the clearly erroneous test. *City of Mishawaka, Indiana v. American Electric Power Company, Inc.,* 616 F.2d 976, 979 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981).

### Standing

DuPage County had raised the issue of the plaintiffs' standing earlier by Motion for Summary Judgment. At that time, Judge Will sustained the standing of the individual plaintiffs and HOPE, Inc. while rejecting the standing of a third plaintiff. *See Planning for People Coalition v. DuPage County, Illinois,* 70 F.R.D. 38 (N.D.Ill. 1976).

Judge Will found regarding the individual plaintiffs that:

... plaintiffs, by defining 'low and moderate income persons,' have alleged injury to two classes of individuals who could be granted relief by this Court if the allegations of the complaint are proven; that they have alleged facts indicating an intentional effort by the County to exclude low and moderate income persons from the County and thereby preclude blacks and other minorities from residing in DuPage County in any substantial numbers; that they have alleged facts indicating a conspiracy between the County and developers to accomplish this exclusion; and, finally, they have alleged facts establishing that, absent such a conspiracy, low or moderate income housing which they and other members of the two classes of 'low' and 'moderate' income persons would use and could afford would be built somewhere in DuPage County. Based on these allegations, we hold that the individual plaintiffs have standing to bring this action.

*Id.* at 47.

Judge Will further held that:

Using the *Warth* approach in regard to the claims of H.O.P.E., Inc., we hold that it also has standing. In *Warth,* Justice Powell held that an association has standing only if it alleges injury to itself or to its members or any one of them. In this

case, since H.O.P.E., Inc. alleges that a number of its directors are low or moderate income persons who are actively seeking adequate housing in DuPage County, it has standing to litigate their claims. *Id.* It was found by the district court that Planning for People Coalition made no allegations of "a 'judicially cognizable' cause of action" and thus didn't have standing. *Id.* at 48.

At the time of its Summary Judgment motion, and renewed now on appeal, DuPage contends that this case is indistinguishable from *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) and that dismissal is required. Additionally, DuPage contends that the district court found standing because of the allegations of conspiracy and since the court found no conspiracy between the builders and the County, the plaintiffs have no standing.

Standing is the threshold question presented to a federal court for determination of whether it shall exercise jurisdiction. As the Supreme Court held in *Warth,* the essence "of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." 422 U.S. at 498, 95 S.Ct. at 2205. In order for a plaintiff to satisfy the constitutional limits of federal jurisdiction, he must allege "that he has personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors, et al. v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 260–61, 97 S.Ct. 555, 560–61, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *Warth, supra* 422 U.S. at 499, 95 S.Ct. at 2205; *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). It is also necessary that the injury alleged can be fairly traced to the actions of the defendant and that the injury shown is likely to be redressed by a favorable decision. *Simon,* 426 U.S. at 38, 41, 96 S.Ct. at 1924, 1925. A plaintiff satisfies the redressability argument of standing when it is shown that a favorable decision will relieve a personal discrete injury. "He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente,* 456 U.S. 228, 244 n. 15, 102 S.Ct. 1673, 1682 n. 15, 72 L.Ed.2d 33 (1982) (emphasis in original).

The prudential limitations of standing seek to prevent litigation of a generalized grievance or questions of broad social import where individualized rights cannot be vindicated. *Gladstone, Realtors,* 441 U.S. at 100, 99 S.Ct. at 1608; *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. Access to federal court is limited to those litigants that can assert a particular claim, their own legal interests rather than the claims or interests of third parties. *Gladstone,* 441 U.S. at 100, 99 S.Ct. at 1608, *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. In other words, the plaintiff must allege a distinct and palpable injury to himself, though he can share that injury with a large class of other potential litigants. *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206.

It must be pointed out that for the purposes of ruling on a motion to dismiss for want of standing or for reviewing the issue of standing on appeal, the court must accept as true all material allegations of a complaint and construe the complaint in a light most favorable to the plaintiff. *Id.*

In *Warth v. Seldin,* the plaintiffs were a not-for-profit New York corporation concerned with the critical housing needs of low and moderate income persons and several named individuals fitting within the classification of low and moderate income persons. The plaintiffs claimed that the town of Penfield's zoning ordinance had the purpose and effect of excluding persons of low and moderate income by making it practically and economically impossible to construct sufficient housing to satisfy local

needs. The Supreme Court found, however, that the petitioners had not alleged "facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield ..." *Id.* at 504, 95 S.Ct. at 2208. The Court added that the plaintiff challenging a zoning ordinance need not have a "present contractual interest in a particular project" but that a particularized personal interest could be shown in various ways. *Id.* at 508 n. 18, 95 S.Ct. at 2210 n. 18. *See Bryant v. Yellen,* 447 U.S. 352, 368, 100 S.Ct. 2232, 2241, 65 L.Ed.2d 184 (1980) (because of the possible effect upon land prices if a restriction were to be enforced, the Court found "a sufficient stake in the outcome of the controversy to afford them standing.")

 In this instance, the plaintiffs have alleged that they fall within the categories of eligibility for low and moderate income housing. They have also alleged that but for the statements made and policies followed by the County Board and its appointees on the Zoning Committee and Board, which influenced land developers, adequate housing would have been constructed. These plaintiffs have supported these allegations by evidence of statements made in opposition to the NAACP project, the Wheaton project and the Glendale Heights project. These latter two projects indicate that as long as the projects are for the elderly, construction was acceptable but modification of a proposal to include families resulted in disapproval.

Contrary to *Warth* which found there was no indication in the record that the defendants' conduct was the substantial cause of the lack of housing but that the petitioners' inability to find housing in Penfield was a "consequence of the economics of the area housing market" (*Warth,* 422 U.S. at 506, 95 S.Ct. at 2209), it must be pointed out that at the very time this case was filed in 1971, there was already in existence in DuPage County a significant subsidized housing development, Mayslake Village. Stip. of Evid. ¶ 1288, p. 2064.

Mayslake Village now consists of 481 units, 433 of which are subsidized. 335 of the subsidized units were constructed between 1964 and 1972. Though these units are for the elderly, it would seem reasonable to infer that the presence of a subsidized development at all suggests that developers were willing and would build other subsidized developments including low and moderate income developments, absent some restraining factor.

Secondly, the land at issue in the instant case is vast. Two hundred nine and one-half square miles of DuPage County are unincorporated. Stip. of Evid. ¶ 10, p. 5. Approximately 40 percent of the total land area of the County is subject to the County's developmental control. Opinion at 30. Given the acreage involved in comparison (in *Warth* it was 36 square miles of Penfield) it seems inconceivable to write off plaintiffs' injury here as a "consequence of the economics of the housing market." Instead, in at least this unusual case, it seems reasonable to infer that absent some restraint on the market, such as defendants' assertedly illegal conduct, low and moderate income housing would have been built in these vast areas.

Additionally, the plaintiffs alleged in their complaint that there was a conspiracy between the County Board and developers which prevented the construction of adequate housing to meet the needs of the plaintiffs of low and moderate income. While the plaintiffs ultimately failed to prove this allegation before the district court, these allegations are deemed true for the purpose of examining the question of standing. Examining these pleadings, these individual plaintiffs have alleged a distinct and palpable injury—deprivation of adequate housing for themselves and their families, which is fairly traceable to the alleged conspiracy between the County and the developers.

While it is true, as the appellants argued before this Court, that there have been no instances of the County Board denying a special use permit or a zoning variance or for that matter, a filing of such requests,

the absence of such a specific denial does not prevent the existence of a palpable injury. These plaintiffs sought and are seeking adequate housing for themselves and other low to moderate income people in DuPage County but to no avail. We do not believe that these plaintiffs had to present a particular developer or project that had been rejected by the Board. As the footnote in *Warth, supra,* indicated, a particularized interest can be shown in various ways. In addition to the public statements regarding the NAACP project, there are the actions of the various Board members opposing the modification of the Wheaton and Glendale Heights projects to include low-income families. The frequent inquiries by the Zoning Board of developers as to the cost of the housing or the rentals and "what type of people" would occupy the development all veiled a hostile attitude or prejudice towards types of possible residents. Public statements by County executives regarding the "cancer" of low-income housing and "you can think that [not wanting blacks in the neighborhood] but you are not permitted to say it" (Opinion at 67 (County Zoning Board Chairman to a remonstrating resident)), are indicative of an attitude which must be examined. As the Supreme Court held in *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 563–64, when determining whether discrimination is a motivating factor, it is necessary to make a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" under the suggested criterion of *Arlington Heights.*

In *Arlington Heights,* the Metropolitan Housing Development Corporation (MHDC), a non-profit developer, sought to rezone some property from a single-family to a multiple-family (R–5) classification. After denial of the rezoning petition, MHDC and individual petitioners filed suit for injunctive and declaratory relief alleging violation of Equal Protection Clause and the Fair Housing Act. The Supreme Court held that MHDC had met the constitutional standing requirements, despite its contingency property position, because of its economic expenditures in support of its

zoning petition and its non-economic injury, the defeat of its "interest in making suitable low-cost housing available in areas where such housing is scarce." 429 U.S. at 263, 97 S.Ct. at 562. The Court also found that an individual petitioner had standing because he had asserted that his quest for housing nearer his employment had been thwarted by the discriminatory official action. If the relief sought was granted, there was a "substantial probability" that the project would materialize and the individual would obtain the housing he desired in Arlington Heights. *Id.* at 264, 97 S.Ct. at 562.

In this action, these plaintiffs evidenced housing proposals which had sought to be modified to provide for low income families but were stymied by Board pressure. It has been stipulated that there were HUD Block Grants ($10,275,000) which could have been utilized for the promotion of low and moderate income housing, but the County Board failed to utilize these opportunities. (Stip. of Evid. ¶ 1179–1181, 1202, 1204, pp. 1829, 1859, 1861; Supp.Stip. of Evid. ¶ S–265, S–289, pp. 709, 846). The County Board argues that it cannot be responsible for what the County Housing Authority or other municipal group does or does not do, but it conveniently forgets that it appoints the Housing Authority and that it has input into policy decision, i.e., Glendale and Wheaton projects. This Court finds that the district court was not clearly erroneous when it found under the *Arlington Heights* sensitive inquiry that these plaintiffs had alleged and demonstrated a personal, palpable, discriminatory injury clearly resulting from the illegal actions, in some cases inaction, of the County Board.

While we have held that these plaintiffs have standing, we also hold that HOPE, Inc., as an organization has standing. HOPE, an Illinois not-for-profit corporation was found by the district court to have standing because it represented its low and moderate income directors who were seeking housing. We agree but we also hold that as an organization seeking to find adequate housing for low and moderate income

persons, it has standing. HOPE, between July 1971 and April 1977, received over 1,100 requests for help in finding housing (Stip. of Evid. ¶ 821, p. 1346) yet few of these searches were successful because of the lack of sufficient numbers of suitable, adequate housing units. HOPE argues the discriminatory practices of the County Board have prevented them from providing or referring applicants to adequate housing in the County.[3]

Last term in the Supreme Court, a non-profit corporation whose purpose was to make equal housing opportunities a reality in Richmond, Virginia was found to have standing. In *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982), a unanimous Court found that:

> [i]f, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's [Housing Opportunities Made Equal] ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests, *see Sierra Club v. Morton,* 405 U.S. [727] at 739 [92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) ].

The footnote to the above quotation holds the alleged injury from HOME's non-economic interest in encouraging open housing did not deprive the organization of standing. *Id.* n. 20. *See also Arlington Heights,* 429 U.S. at 263, 97 S.Ct. at 562.

We hold that HOPE has shown demonstrable injury to its organizational purpose and activities to satisfy Article III standing requirements. Additionally, HOPE satisfies the prudential limitations of *Warth,* in that it has not alleged a generalized grievance, and in that it is asserting its own legal rights and interest and not those of a third party.

## Ripeness

The defendants further argue that the district court judgment should be reversed because there is no case or controversy ripe for adjudication. It is argued that the lack of any actual or proposed project rejected by the County Board demonstrates that there is no controversy for the court's consideration. This Court cannot agree. The plaintiffs have, through a very thorough review of the County Zoning records, demonstrated that the Zoning Board members and County executives have conveyed through questions and statements the attitude of the County Board toward low and moderate income family housing. It need only be pointed out that in the six-year period from 1967 to 1972 over 50% of the new housing units constructed in the unincorporated area were multi-family housing

---

**3.** The district court found that: "HOPE has purchased existing, unoccupied houses in incorporated areas of DuPage County, rehabilitated them with volunteer workers and then rented or sold them to persons with low or moderate incomes. Until 1975, HOPE provided the only low rent housing available in DuPage County.

HOPE also maintains a list of the relatively few federally subsidized units in DuPage County for moderate or low income families and refers families to any available units. At present, all federally subsidized units have waiting lists. HOPE has also advised and provided support services to low income families including budget counseling, distribution of donated furnishings and appliances, and referrals for financial, family, social security and legal assistance. It also engaged in educational and community organizing programs which are designed to facilitate housing programs for families and the elderly with low and moderate incomes.

As part of its activities, HOPE, at a time when the Housing Authority had no staff, prepared an application, in response to a June 1975 invitation from HUD to the County to apply for funds under Section 8 of the National Housing Act, to acquire and rehabilitate 77 existing housing units. The Chairman of the Housing Authority contacted Sonja Faulkner of HOPE and asked if she would prepare the application. The application, including an equal opportunity plan, utility schedules, etc., was prepared, submitted and approved. As a result, the County has 77 units in existing structures available for the elderly and low income families." Opinion at 37–38.

developments. Opinion at 90 n. 3; Stip. of Evid. ¶ 26 Q(5)–(6), pp. 44–45. Yet not one of those developments were for low or moderate income families. This was the same time period, however, that the NAACP and the City of Wheaton were considering their developments. These plaintiffs, and the non-profit organization HOPE, have demonstrated that over the past decade or more they have sought adequate housing for themselves or their constituents with little success.

■ We find, as did the district court, that these plaintiffs have presented a definite and concrete controversy touching the legal interests of the adverse parties. *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). We do not find that these plaintiffs have presented to the court "abstract questions of wide public significance" (*Warth,* 422 U.S. at 500, 95 S.Ct. at 2206), but rather a substantial controversy seeking specific relief of a conclusive nature. *Aetna Life,* 300 U.S. at 241, 57 S.Ct. at 464.

The defendants have paraphrased the district court's holding to be "if these plaintiffs do not have standing, then no one does." Appellants' Brief at 28. They then argue that this position was specifically rejected by the Supreme Court in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 489, 102 S.Ct. 752, 767, 70 L.Ed.2d 700 (1982) ("[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." (citation omitted)).

The district court found, and we agree, that:

> [w]hile it is true that a lawsuit must involve an issue ripe for adjudication, that does not require in a housing discrimination case that a specific project be involved when the challenged policy effectively precludes all such projects. If it did, the more effective the implementation of a discriminatory policy, the less opportunity there would be to challenge it.

Opinion at 95. We hold the absence of a particular denial of a development does not prevent the presentation of a live case or controversy ripe for adjudication.

## II

The defendants argue that the plaintiffs have failed to establish that any of their constitutional rights were violated. The County argues that to prevail, the plaintiffs must prove a purposeful, intentional, invidious discrimination. It is contended that since no suspect classification was alleged or proved by the plaintiffs, the traditional equal protection analysis should be applied to the zoning ordinances and decisions. The County Board argues that the "court failed to impose on the plaintiffs the burden of establishing that the zoning ordinance and the decisions of the Zoning Board were wholly unrelated to the achievement of *any* legitimate governmental interest." Appellants' Brief at 30 (emphasis in original). The County Board argues that the actions of the Zoning Board and Planning Commission represented legitimate government interests in the preservation of property values, development of local services and the preservation of open space.

The district court found that there was substantial opposition, however, to low and moderate income housing on both economic and racial grounds. In reaching that conclusion, the district court held that:

> ... it will not be sufficient for plaintiffs to establish that defendants discriminated against them on economic grounds alone and that such economic discrimination had a disproportionate racial impact, but plaintiffs must demonstrate that defendants purposefully discriminated against them on invidious grounds such as race. *Washington v. Davis,* 426 U.S. 229, 242 [96 S.Ct. 2040, 2048, 48 L.Ed.2d 597] (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265 [97 S.Ct. 555, 563, 50 L.Ed.2d 450] (1977).

Opinion at 20. Thus imposing upon the plaintiffs a showing of intentional acts.

The district court looked at the zoning restrictions which have been part of the DuPage County zoning ordinances and found that these restrictions have been waived in "substantial" numbers (50% of housing units between 1967 and 1972) so long as applicants met the County's or Zoning Board's criteria. Thus, the "Growth Node" concept,[4] proposed only in 1969, was not followed when a proposal met certain criteria. The district court found this criterion was:

> ... whether the development would be occupied by residents who were 'compatible' with the existing white residents who are 'in a fairly good economic strata' so that DuPage County would remain one of the richest counties in the United States measured by per capital income and almost 100% white.

*Id.* at 86. Based upon the record, the court found that these plaintiffs had proved intentional invidious discrimination motivated the County defendants in establishing a zoning ordinance and then granting or denying variations dependent upon the race and economic strata of the proposed residents.

In *Arlington Heights, supra,* the Supreme Court found that while the Village zoning decisions bore heavily upon racial minorities, there was no evidence that the zoning ordinances were not consistently applied nor evidence that the Village had intentionally discriminated against the plaintiffs as required by *Washington v. Davis, supra,* 429 U.S. at 269–70, 97 S.Ct. at 565–566.

■ In this case, the court found intentional discrimination against the plaintiffs. This was not clearly erroneous. When there is evidence of an intentional discriminatory purpose, the zoning ordinances and decisions cannot be sustained if they relate to the achievement of "*any* legitimate governmental interest." When there is a proof that a discriminatory purpose has been a motivating factor in the decision, judicial

deference to legislative or administrative decisions is no longer justified. 429 U.S. at 265–66, 97 S.Ct. at 563–64.

■ Similarly, DuPage County did not consistently apply its zoning ordinances or "Growth Node" when 50% of the housing units in the unincorporated area were granted variances if they met the compatibility criteria of the County Board. Ordinances and zoning decisions which in practice are utilized to exclude the poor and racial minorities, as applied, do not bear a rational relationship to a legitimate state purpose. *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 172, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768 (1972); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). As Justices Harlan and Stewart wrote in *Douglas v. California,* 372 U.S. 353, 361, 83 S.Ct. 814, 818, 9 L.Ed.2d 811 (1963):

> ... [s]tates, of course, are prohibited by the Equal Protection Clause from discriminating between "rich" and "poor" *as such* in the formulation and application of their laws.

(dissent) (emphasis in original). Distinctions and differentiation among citizens upon their racial or economic compatibility cannot be a legitimate government interest under the Equal Protection Clause. *See generally United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *Edwards v. California,* 314 U.S. 160, 184–85, 62 S.Ct. 164, 171–72, 86 L.Ed. 119 (1941) (Jackson, J. concurring); *Morales v. Haines,* 349 F.Supp. 684, 686 (N.D.Ill.1972), *modified,* 486 F.2d 880 (7th Cir.1973). These plaintiffs have shown that their constitutional rights were violated.

### III

The defendants argue finally that the remedy structured in the Judgment and Decree of the district court is unrelated to the violations found by that court and is a

---

4. Under the "Growth Node" concept, the County sought to channel high density land uses into the incorporated areas where, they asserted, there were more adequate facilities including sanitary sewers, storm sewers, water, roads and transportation. Stip. of Evid. ¶ 1379, pp. 2126–2127.

usurpation of local governmental authority. We have previously outlined the provisions of the Decree at pp. 8–9, *infra*.

 "Once a constitutional violation is found, a federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.'" *Hills v. Gautreaux*, 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544–45, 47 L.Ed.2d 792 (1976) (citations omitted). In shaping the equitable remedies for the constitutional violations it found, the district court is vested with broad discretionary powers. The review of such power is limited narrowly to an abuse of discretion. *Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *United States v. City of Chicago*, 631 F.2d 469, 472 (7th Cir.1980).

We recognize that zoning is a local governmental function. *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The district court's Decree does not usurp that local power. The Decree does not, as argued by the County Board, require federal intervention in disputes over zoning for low and moderate income housing. The Decree enjoins the enforcement of the minimum lot sizes, acreage, etc. in respect to low and moderate income housing. It similarly suspends the requirement of a special use permit for construction of low and moderate income multi-family dwellings. It was through the requirements and enforcement of these two areas that adequate low and moderate income housing was prevented. The district court did not mandate the construction of a specified number of housing units, rather it directed the County to develop its own ten-year plan to significantly increase the number of units.

 The Decree of the district court was targeted to what it viewed as the violation—the *use* of the zoning powers and ordinances to create a homogeneous, racially and economically compatible community. Such an equitable remedy was not overly broad as to usurp the local zoning powers and hence, did not constitute an abuse of discretion. This Decree was simply an attempt to implement the purported housing goals of DuPage County. The purpose of the Decree was to simply make the application of zoning equitable to all citizens and to assure "a meaningful amount of housing for families with low and moderate incomes" actually available in DuPage County. Decree at 9.

The decision of the district court is AFFIRMED.

COFFEY, Circuit Judge, dissenting.

The majority, in this appeal, has affirmed the district court's finding that the DuPage County Board engaged in discriminatory housing practices against both racial minorities and low and moderate income individuals. In doing so, it has upheld the district court's injunction against the County Board which prevents the defendant Board from perpetuating and promoting such conduct in the future. Because I believe the plaintiffs lack standing to initiate the present cause of action under the Supreme Court decision of *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) and its progeny, I would reverse the district court, and I therefore respectfully dissent.

In its recent consideration of the issue of standing the United States Supreme Court, in *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), emphasized the essential nature of the existence of standing to the exercise of judicial power.

"But of one thing we may be sure: Those who do not possess Art. III standing may not litigate as suitors in courts of the United States. Article III, which is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787, a charter which created a general government, provided for the interaction be-

tween that government and the governments of the several States, and was later amended so as to either enhance or limit its authority with respect to both States and individuals."

454 U.S. at 475–76, 102 S.Ct. at 760–761 (footnote omitted).

The Court also explained that the concept of standing "subsumes a blend of constitutional requirements and prudential considerations." 454 U.S. at 471, 102 S.Ct. at 757–58. According to the Supreme Court, the minimum constitutional requirements of standing are as follows:

"[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision,' *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976)."

454 U.S. at 472, 102 S.Ct. at 758 (footnote omitted). Thus, the minimum constitutional requirements for standing appear to be reducible to three necessary elements. The plaintiff must show that: (1) he has sustained some actual or threatened injury; (2) the preceding injury is fairly traceable to the challenged action; and (3) judicial intervention will actually redress the asserted injury. A failure to allege any one of these elements mandates dismissal for lack of standing.

From the outset of this litigation the defendant-appellant DuPage County has properly challenged the plaintiffs' standing to bring this action based upon the plaintiffs' complete inability to allege even a single instance wherein the DuPage County Board has denied a special use permit or zoning variation for a specific low or moderate income housing project, much less has

in any tangible way impeded the development of such projects. It should be noted that although the district court's findings of fact and conclusions of law are extensive,[1] it fails to contain the basic finding required in cases challenging "standing," i.e., that the defendant-appellant DuPage County specifically denied either a special use permit or zoning variation for a proposed low or moderate income housing project. Even the majority admits the total lack of such evidence or allegations. *See* majority opinion at 1072.

Without an assertion of such action on the part of the County Board, the defendant contends that the plaintiffs have failed to allege: (1) that they have suffered a palpable injury as a result of the defendant's "putatively illegal conduct"; (2) that their asserted injury "fairly can be traced to the challenged action" of the defendant; nor (3) that judicial intervention will specifically redress their asserted injury. The defendants properly rely on the holding of the United States Supreme Court in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) to support their contention that in the absence of allegations concerning a specific project, the plaintiffs lack standing.

The district court, however, disagreed. Although it conceded there had never been a request to rezone land for a project to construct low or moderate income housing, it concluded:

"While it is true that a lawsuit must involve an issue ripe for adjudication, that does not require in a housing discrimination case that a specific project be involved when the challenged policy effectively precludes all such projects. If it did, the more effective the implementation of a discriminatory policy, the less opportunity there would be to challenge it."

District court opinion at 95. The majority, in its analysis of ripeness, has concurred with the district court's reasoning. "We hold the absence of a particular denial of a

---

1. The district court's findings of fact, conclu- sions of law and opinion comprise 101 pages.

development does not prevent the presentation of a live case or controversy ripe for adjudication." Majority opinion at 1075.[2]

The preceding discussion demonstrates that the central issue to be resolved, with respect to standing, is whether in the absence of even a single denial by the defendant DuPage County of a request for a special use permit or zoning variation for a low or moderate income housing project, the plaintiffs have sustained an "actual injury," which "fairly can be traced to the challenged action," and which can be redressed by judicial action as is constitutionally required to establish standing. *See Warth* and *Valley Forge, supra.* The majority, in its analysis of this issue, was required to follow the mandate of the United States Supreme Court as set forth in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Had the majority seriously intended to follow that Supreme Court precedent, it would logically have been required to conclude that the plaintiffs lack standing. Instead, the majority, through its desire to achieve social justice (the abstract desirability of which is not contested by this dissent), has been forced to twist and manipulate the *Warth* requirements in order to obtain its coveted result. In doing so, the majority succeeds only in muddying the water with respect to the question of standing and thereby has significantly reduced predictability in this area of the law—a quality which is absolutely essential to litigants, the bench and the bar.

The similarities of this case to *Warth v. Seldin* are both striking and compelling. As in the present action, *Warth* involved a claim that a zoning ordinance, by its terms and as enforced effectively excluded persons of low and moderate income from living in the area covered by the zoning ordinance. The plaintiffs in *Warth,* like the plaintiffs in the present case, included both individuals of low and moderate income allegedly seeking housing in the zoned area,

and a not-for-profit organization whose stated purpose was to foster action to alleviate a local housing shortage for low and moderate income persons.

The *Warth* Court ultimately held that the individual plaintiffs lacked standing to sue because the plaintiffs had failed to establish a "demonstrable, particularized injury" necessary to satisfy the constitutional requirements of standing. 422 U.S. at 508, 95 S.Ct. at 2210. As is the case in the present appeal, the Supreme Court in *Warth* was required to accept as true all material allegations of the complaint. 422 U.S. at 501, 95 S.Ct. at 2206. Thus, the Supreme Court stated:

> "We must assume, taking the allegations of the complaint as true, that Penfield's zoning ordinance and the pattern of enforcement by respondent officials have had the purpose and effect of excluding persons of low and moderate income, many of whom are members of racial or ethnic minority groups. We also assume, for purposes here, that such intentional exclusionary practices, if proved in a proper case, would be adjudged violative of the constitutional and statutory rights of the persons excluded."

422 U.S. at 502, 95 S.Ct. at 2207. Notwithstanding these assumptions, the Supreme Court, after a careful, thoughtful and well-reasoned analysis, denied standing to the plaintiffs in *Warth.* The basis for that decision was the plaintiffs' failure to meet the requirement of a particularized injury.

> "But the fact that these petitioners share attributes common to persons who may have been excluded from residence in the town is an insufficient predicate for the conclusion that petitioners themselves have been excluded, or that the respondents' assertedly illegal actions have violated their rights. Petitioners must allege and show that they personally have been injured, not that injury has

**2.** As the quote from the majority indicates, the absence of a specific low or moderate income housing project also raises a question as to whether a constitutionally ripe "case or controversy" exists in this case. The "case or controversy" question conceptually overlaps the question of standing addressed in this dissent. Because the standing issue completely resolves this appeal, I find it unnecessary to address the ripeness issue.

been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, 'none may seek relief on behalf of himself or any other member of the class.' *O'Shea v. Littleton*, 414 U.S. 488, 494 [94 S.Ct. 669, 675, 38 L.Ed.2d 674] (1974). See, *e.g.*, *Bailey v. Patterson*, 369 U.S. 31, 32–33 [82 S.Ct. 549, 550–551, 7 L.Ed.2d 512] (1962)."

422 U.S. at 502,[3] 95 S.Ct. at 2207.

The *Warth* Court explained, in its application of the constitutional requirement of a "particularized injury" to the factual situation presented in the challenge to the zoning ordinance, that prospective plaintiffs, in order to gain standing, are required to demonstrate that absent the alleged unconstitutional acts, they could have found adequate low or moderate income housing in the area encompassed by the zoning ordinance:

"We may assume, as petitioners allege, that respondents' actions have contributed, perhaps substantially, to the cost of housing in Penfield. But there remains the question whether petitioners' inability to locate suitable housing in Penfield reasonably can be said to have resulted, *in any concretely demonstrable way,* from respondents' alleged constitutional and statutory infractions. Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a *substantial probability* that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed. *Linda R.S. v. Richard D.,* 410 U.S. 614 [93 S.Ct. 1146, 35 L.Ed.2d 536] (1973)."

422 U.S. at 504, 95 S.Ct. at 2208 (emphasis added).

The Supreme Court's requirement in *Warth* that the individual plaintiffs establish that absent the town's "restrictive zoning practices," they would be able to find the desired low or moderate income housing is based in part on its recognition that the availability of low and moderate income housing depends not only on zoning practices, but also *"on the efforts and willingness of third parties to build low- and moderate-cost housing."* 422 U.S. at 505, 95 S.Ct. at 2208 (emphasis added).

The plaintiffs' failure to demonstrate that they were, in fact, financially able to occupy the subsidized housing (the construction of which was allegedly prevented through the unconstitutional application of the zoning ordinance) ultimately led the *Warth* Court to hold that the plaintiffs did not satisfy the basic requirement of establishing "particularized injury." *Id.* at 506–07, 95 S.Ct. at 2209. The Court expressly distinguished its holding from other decisions acknowledging the standing of low-income, minority-group plaintiffs to initiate suits challenging exclusionary zoning practices, by noting that in those cases, the plaintiffs' challenges related *to specific housing projects in which the plaintiffs proved that they intended to and were, in fact, eligible and financially able to reside.*

"In support of their position, petitioners refer to several decisions in the District Courts and Courts of Appeals, acknowledging standing in low-income, minority-group plaintiffs to challenge exclusionary zoning practices. In those cases, however, the plaintiffs challenged zoning restrictions *as applied to particular projects* that would supply housing within their means, and of which they were intended residents. The plaintiffs thus were able to demonstrate that unless relief from assertedly illegal actions was forthcoming, their immediate and personal interests would be harmed. Petitioners here assert no like circumstances. Instead, they rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have

---

**3.** Note that the majority admits that all but one of the plaintiffs in the present action are now or were residents of DuPage County, and thus

have *not* been excluded from obtaining housing in the county. *See* majority opinion at 1065.

been better had respondents acted otherwise, and might improve were the court to afford relief."

422 U.S. at 507, 95 S.Ct. at 2209 (emphasis added) (footnote omitted).

In the case at bar, there have been no allegations nor proof offered by the individual plaintiffs establishing that any proposed project for low or moderate income housing was in any way impeded, much less denied, by specific activity on the part of the DuPage County Board. Furthermore, there is a complete absence of facts in the record indicating that, in fact, any third parties actually existed who were ready, willing and able to build low or moderate income housing in the unincorporated portions of the county were it not for the challenged zoning ordinance and the allegedly unconstitutional enforcement thereof. Thus, even assuming that the plaintiffs could have afforded any housing project that might have been constructed, there has been no showing of any activity by the County Board which has either directly or indirectly injured the plaintiffs. Without that showing, the individual plaintiffs fail in their quest for standing because of their inability to allege a "particularized injury" which "fairly can be traced to [any] challenged action" of the defendant County Board. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (*quoting Simon,* 426 U.S. at 41, 96 S.Ct. at 1925). This is the very quicksand on which the individual plaintiffs' and the majority's argument falters. As the Supreme Court stated in *Warth,* a plaintiff "who seeks to challenge exclusionary zoning practices *must allege specific, concrete facts demonstrating that the challenged practices harm him . . . .*" 422 U.S. at 508, 95 S.Ct. at 2210 (emphasis added). Since the individual plaintiffs have failed to produce a single instance wherein the County Board has denied a zoning variance or special use permit for proposed low or moderate income housing, and thus have been unable to allege, much less prove, *any* "challenged activity" of the Board which *caused* their alleged injury, they fall short in their attempt to establish standing under the guidelines enunciated by the Supreme Court in *Warth v. Seldin.*

The individual plaintiffs' failure to establish standing is not confined to the preceding shortcomings, however. The *Warth* Court also stated that a plaintiff "must allege specific, concrete facts demonstrating . . . that he personally would benefit in a tangible way from the court's intervention." *Id.* In other words, the plaintiffs are, in addition, required to demonstrate that "absent the [County Board's] restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in [DuPage County] and that, if the court affords the relief requested, the asserted inability of petitioners will be removed." *Id.* at 504, 95 S.Ct. at 2208. As previously indicated, the plaintiffs' unsubstantiated allegations do not demonstrate that absent the conduct of the DuPage County officials there is a substantial probability that low and moderate income housing would be constructed in the unincorporated portions of DuPage County which would satisfy the plaintiffs' needs. There is no evidence in the record indicating that, in fact, any third parties even existed who had both the financial ability and the interest to construct low or moderate income housing. Thus, the individual plaintiffs failed to show how they "personally would benefit" from the district court's or this tribunal's intervention, as is required, under both *Warth* and *Valley Forge,* to establish standing. The individual plaintiffs in the instant case have alleged little more than a "remote possibility," speculative and unsubstantiated by any concrete facts, that their situation *might* be better had DuPage County acted otherwise and *might* improve were the court to afford relief. *Warth v. Seldin* clearly establishes that such a showing of "remote possibility" does not and must not be allowed to satisfy the constitutional requirements for standing to sue. 422 U.S. at 507, 95 S.Ct. at 2209.

Obviously, the majority disagrees. They argue that, unlike *Warth,* the plaintiffs' inability to find adequate housing is not a "consequence of the economics of the area

housing market." To support that position they point to two facts found in the stipulation of evidence: (1) that Mayslake Village was constructed between 1964 and 1972, and (2) that 209½ square miles of DuPage County are unincorporated. The existence of these facts leads the majority to find that absent "some restraining factor" builders were ready, willing and able to construct low and moderate income housing. Note that after the citation of each of the above facts, the majority concludes "it seems reasonable to infer . . ." which translated means "we are purely speculating in the hope that we might achieve our end . . . ." These two references make it clear that the majority, by its use of unsupported statements and conclusions, is attempting to radically expand the standing rights of potential plaintiffs. This, I submit, is not the responsibility of the Circuit Court of Appeals.

Although the majority agrees with this dissent on the requirements of the controlling case law, it has come to a different conclusion in order to achieve its view of appropriate social policy and thereby, as I stated above, subtly but substantially expands the number of litigants who can now obtain standing to sue, contrary to the *Warth* mandate, in an already overburdened court system. According to the majority, the individual plaintiffs have somehow and somewhere (a place which I have been unable to discern) alleged a distinct and particular injury which was fairly traceable to the alleged conspiracy between the County and the developers.

"In this instance, the plaintiffs have alleged that they fall within the categories of eligibility for low and moderate income housing. They have also alleged that but for the statements made and policies followed by the County Board and its appointees on the Zoning Committee and Board, which influenced land developers, adequate housing would have been constructed. These plaintiffs have supported these allegations by evidence of statements made in opposition to the NAACP project, the Wheaton project and the Glendale Heights project. These lat-

ter two projects indicate that as long as the projects are for the elderly, construction was acceptable but modification of a proposal to include families resulted in disapproval.

\* \* \* \* \* \*

"Additionally, the plaintiffs alleged in their complaint that there was a conspiracy between the County Board and developers which prevented the construction of adequate housing to meet the needs of the plaintiffs of low and moderate income. While the plaintiffs ultimately failed to prove this allegation before the district court, these allegations are deemed true for the purposes of examining the question of standing. Examining these pleadings, these individual plaintiffs have alleged a distinct and palpable injury—deprivation of adequate housing for themselves and their families, which is fairly traceable to the alleged conspiracy between the County and the developers."

Majority opinion at 1072. These allegations, according to the majority, are enough to meet the constitutional requirements of standing.

At the outset it behooves me to point out that the evidence the majority cites—the NAACP project, the Wheaton project and the Glendale Heights project—in support of the individual plaintiffs' allegations should be accorded no weight whatsoever. With regard to the NAACP project, the majority refers to the fact that Fred Koebeman, "a member of the County Board and Zoning Committee, 'was asked at a public hearing whether he favored the proposed NAACP project and [he] replied flatly "no".' " Majority opinion at 1067 (*quoting* the district court's opinion at 49). Since there may have been many reasons why Koebeman was not in favor of the project, such as a lack of public support or the incompleteness of the NAACP's proposal, it is incomprehensible how the majority can justify its assertion that this statement *of personal opinion* supports the plaintiffs' allegations of discriminatory activity *on the part of the*

*Board.* It should also be noted that the NAACP project did not die because of some action on the part of the County Board. Rather, the demise of the project was due to lack of funds, a point the majority deftly neglects to recite. District court record, Stip. of Evid. ¶ 1273(L) & (M), pp. 2050–55. Finally, since the County Board can only act as a group, *see infra* discussion at 1087–1088, unauthorized statements made by individual Board members outside the confines of an official Board meeting cannot bind the County Board and are therefore irrelevant, and should not be considered in the determination of the alleged discriminatory activity of the Board.

The evidence regarding the Wheaton project is likewise unsupportive of the plaintiffs' claim of standing. It cannot be denied that the Executive Committee of the DuPage County Board discussed with, and expressed its views to the City of Wheaton officials. However, it was neither Board action nor Board pressure that caused this project to be canceled. As the majority admits, the Wheaton proposal became a campaign issue in the 1971 elections for the Wheaton City Council. "[A] slate of candidates who opposed the proposal was elected and, subsequently, authority to apply for HUD funds was revoked by the *Wheaton City Council.*" Majority opinion at 10–11 (emphasis added). Thus, if the Wheaton proposal is the basis of the present action, the Wheaton City Council should be the defendants *not the DuPage County Board* which had absolutely nothing to do with the ultimate withdrawal of the project.

I likewise have problems with the majority's citation of the Glendale Heights project in support of the plaintiffs' case for standing. The second amended complaint in this action was filed in September of 1972. The district court subsequently ruled that the individual plaintiffs had standing in its published opinion, *Planning for People Coalition v. DuPage Cty., Ill.,* 70 F.R.D. 38 (N.D. Ill.1976). Thus, it is hard for me to understand how an event that occurred in 1978 (which is when the HUD funds for the Glendale Heights project were rejected by the County) can be a basis for the plaintiffs'

standing in an action filed in 1972. Standing, as I have noted previously, is a threshold question which concerns the right of a federal court to exercise its judicial power over the asserted cause of action. *Valley Forge,* 454 U.S. at 475–76, 102 S.Ct. at 760–61. Therefore, evidence such as the Glendale Heights project which does not and physically cannot form the basis of the complaint clearly appears to be irrelevant to the question of standing.

Assuming for the sake of argument that evidence concerning the Glendale Heights project is relevant, I still am not convinced that it necessarily supports or justifies the grant of standing to the plaintiffs. The majority points out that the County Board reversed itself with respect to the project and thereby decided to reject the HUD Block Grant funds after it had initially approved the project. *See* majority opinion at 1068. The majority also notes that the rejection occurred after the proposal had been modified to include a "modest eight family housing unit." *Id.* It is my position that this was a completely legitimate action on the part of the County Board since at the time the Board approved the original proposal it did not intend to sign a "blank check" which could be modified at the whim of some other agency. I am aware of no case law which requires a board to stand by its original approval after the proposal has been altered or modified. Would it not be a legitimate exercise of the County Board's power to withdraw its original approval in order that the people of Glendale Heights be given an opportunity to express their approval or disapproval of the proposal as modified? Yet the majority somehow draws the inference of discriminatory purpose without citing even a scintilla of evidence in its opinion, or the district court's opinion (which it follows), to support that inference. Since a completely innocent reason could very well have motivated the County Board to withdraw its approval, and since there is no evidence cited to support the majority's position of discriminatory purpose, it seems apparent to me that the majority is making the plaintiffs' case for

them in order to achieve their desired social policy.

In regard to the Glendale Heights project the majority also refers to an incident involving Ruth Kretchmer, a member of the County Board, who "appeared at a Glendale Heights public meeting and indicated that the County Board would approve the project only if there was 'overwhelming' support from the community for the proposal." Majority opinion at 1068. Notwithstanding my position that such evidence cannot be imputed as an action of a majority of the Board, *see infra* discussion at 1087, I am concerned with the fact that the majority failed to recite the complete text of Ms. Kretchmer's statement which was as follows:

> "[T]he County Board members are going to be very reluctant to approve this proposal unless there is adequate proof that it is something that the residents of Village of Glendale Heights want. Fifty-one percent would not be enough. The County Board would want evidence, through the elected officials of the Village, of overwhelming support for this proposal."

District court's opinion at 71. Essentially this was merely an assertion that the Board would follow the wishes of its constituents with regard to this project. Although the quantum of support necessary may have been overstated, the fact that the City of Glendale Heights never resubmitted the project for consideration indicates that, in fact, there was insufficient community support for the proposal in the first instance. The County Board can hardly be blamed for failing to back a project for which community support was limited at best.

Thus, when the evidence cited by the majority as substantiating the plaintiffs' allegations is examined in a discerning light, it is found wanting because it is either irrelevant or utterly fails to support the plaintiffs' position. The plaintiffs' complaint is thereby exposed for what it really is—a collection of naked, general and unsubstantiated accusations without foundation or legal basis in fact. Where, for example, is the allegation that the County Board actually applied its zoning ordinances to block a proposed development? Where also is the assertion that a particular developer intended and had the financial ability to construct low or moderate income housing but was discouraged by Board activity? Such allegations are necessary to support a finding of standing. Obviously, they are absent because the individual plaintiffs plainly are unable to find such facts either inside or outside the record.

I have an even greater concern, however, with the majority's reference to the plaintiffs' bald allegations of conspiracy. This case is a perfect example of the majority's failure to recognize the ease with which one can make an unsupported claim of conspiracy. The plaintiffs' complaint contains no concrete allegation of specific concerted activity on the part of the Board which in any way substantiates the asserted conspiracy, yet the majority appears to place great reliance on these allegations in support of its holding that the plaintiffs have standing. Does the majority, with its statements concerning the allegations of conspiracy, mean that plaintiffs can now make an unsubstantiated claim of conspiracy and thereby avoid, or rather undermine the constitutional requirements enunciated in *Warth v. Seldin?* Without the majority requiring any substantiation of the conspiracy allegations it is hard to interpret its statements in any other fashion. As I have previously stated, I do not believe it is our place, as an intermediate appellate court, to change, undermine or ignore the mandate of the United States Supreme Court. If this issue comes before that Court, it may decide to revise its prior decisions and take the route of the majority by relaxing the requirements of standing, but in the words of my brother, Judge Eschbach, "[w]riting, as I am, on the shores of Lake Michigan rather than the banks of the Potomac, I am not free to make that decision." *Vail v. Bd. of Educ. of Paris Union Sch. Dist. No. 95,* 706 F.2d 1435, 1445 (7th Cir.1983) (Eschbach, J., concurring).

Thus, as I pointed out earlier, when the individual plaintiffs' allegations and evidence are examined in light of *Warth* and *Valley Forge,* it is apparent that they fail to establish a particularized injury which "fairly can be traced to the challenged action" of the defendant, *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (*quoting Simon,* 426 U.S. at 41, 96 S.Ct. at 1925), nor do they allege "specific, concrete facts demonstrating ... that [the individual plaintiffs] personally would benefit in a tangible way from the court's intervention." *Warth,* 422 U.S. at 508, 95 S.Ct. at 2210.

The plaintiffs in *Warth* had, in fact, a stronger case for standing than the individual plaintiffs in the present appeal. In *Warth,* the plaintiffs alleged that Penfield's zoning and planning boards committed specific acts in violation of their rights.

"Petitioners also allege that 'in furtherance of a policy of exclusionary zoning,' ... the defendant members of Penfield's Town, Zoning, and Planning Boards had acted in an arbitrary and discriminatory manner: they had delayed action on proposals for low- and moderate-cost housing for inordinate periods of time; denied such proposals for arbitrary and insubstantial reasons; refused to grant necessary variances and permits, or to allow tax abatements; failed to provide necessary support services for low- and moderate-cost housing projects; and had amended the ordinance to make approval of such projects virtually impossible."

422 U.S. at 495–96, 95 S.Ct. at 2203 (citation omitted). In addition, the plaintiffs in *Warth* were able to allege that the Penfield Planning Board had denied two efforts by developers to construct low- to moderate-cost housing. *See* 422 U.S. at 505, 95 S.Ct. at 2208. These *specific* allegations of wrongdoing, when compared to the unsubstantiated assertions of the individual plaintiffs in the present case, indicate that, in many respects, the plaintiffs in *Warth* alleged a far stronger case for finding standing than the individual plaintiffs in the action at bar. Notwithstanding the strength of the plaintiffs' allegations in *Warth,* the Supreme Court held that they were without standing. Thus, since standing was properly denied in *Warth, a fortiori,* it must be denied in the present case.

The individual plaintiffs, in a feeble attempt to avoid the inevitable outcome of the preceding analysis, cite to the language of a mere footnote in *Warth* to support their contention that a specific allegation of a denial of a particular housing project is not required in order to establish standing.

"This is not to say that the plaintiff who challenges a zoning ordinance or zoning practices must have a present contractual interest in a particular project. A particularized personal interest may be shown in various ways, which we need not undertake to identify in the abstract. But usually the initial focus should be on a particular project. See, *e.g.,* cases cited in n. 17, *supra.* We also note that zoning laws and their provisions, long considered essential to effective urban planning, are particularly within the province of state and local legislative authorities. They are, of course, subject to judicial review in a proper case. But citizens dissatisfied with provisions of such laws need not overlook the availability of the normal democratic process."

422 U.S. at 508 n. 18, 95 S.Ct. at 2210 n. 18.

Rather than supporting the plaintiffs' position, I believe that this footnote reinforces my conclusion that in order to establish standing, the initial focus of the plaintiffs' allegations *must be on a particular project.* The language in the footnote that leaves open the possibility that a "particularized personal interest" might be shown absent a specific project *does not* modify the requirement that the plaintiff prove that his alleged injury is "tangible," "personal," "concretely demonstrable," and fairly traceable to the challenged action. The individual plaintiffs in the case at bar have completely failed to make any tangible showing of a "particularized personal interest" which "fairly can be traced to the challenged action" of the defendant County Board, *see supra* discussion at 1080–1081, nor have they shown that they would receive a bene-

fit if the court acted as they request. *See supra* discussion at 1081–1082.

Note that the majority also cites this particular footnote in support of its position. However, it fails to quote that part of the footnote which indicates that the initial focus should normally be on a particular project. Instead, the majority merely states that a "plaintiff challenging a zoning ordinance need not have a 'present contractual interest in a particular project' but that a particularized personal interest could be shown in various ways," and in so doing, it substantially distorts the import of the footnote. Majority opinion at 1071 (*quoting Warth*, 422 U.S. at 508, n. 18, 95 S.Ct. at 2210 n. 18). By taking the language concerning the lack of an absolute need to allege a "present contractual interest in a particular project" out of context, the majority fails to give requisite deference to the Supreme Court's position that *"usually* the initial focus *should be* on a particular project." *Warth*, 422 U.S. at 508 n. 18, 95 S.Ct. at 2210 n. 18 (emphasis added). The majority, by this deft slight of hand, raises the inference that such a starting point is not generally necessary. Obviously, this was *not* the Supreme Court's intention. Rather, the Supreme Court clearly indicated that a plaintiff's complaint should normally "focus" on a particular project, and that it is only in an "unusual" situation that the plaintiff can disregard such a focus and still establish standing. The similarities of the facts of the present case to those existing in *Warth* indicate to me that this is *not* one of those "unusual" situations.

My position regarding the general requirement that plaintiffs focus on particular projects is bolstered by the *Warth* opinion itself. One of the petitioners in that case, Rochester Home Builders Association, asserted standing to represent its member firms which engaged in the development of housing in the Rochester area, including Penfield. The Court recognized that Home Builders could establish "standing as the representative of its members *only* if it . . . alleged facts sufficient to make out a case or controversy had the members themselves brought suit." 422 U.S. at 516, 95 S.Ct. at 2214 (emphasis added). The Supreme Court found that Home Builders' allegations failed to meet this requirement.

> "The complaint refers to *no specific project* of any of its members that is *currently precluded* either by the ordinance or by respondents' action in enforcing it. *There is no averment that any member has applied to respondents for a building permit or a variance with respect to any current project. Indeed, there is no indication that respondents have delayed or thwarted any project currently proposed by Home Builders' members,* or that any of its members has taken advantage of the remedial processes available under the ordinance. In short, insofar as the complaint seeks prospective relief, Home Builders has failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention."

*Id.* (emphasis added). This quote clearly indicates the need for concrete allegations of discriminatory activity regarding *specific* projects, allegations which are sadly lacking in the case at bar.

As additional support for its conclusion on standing, the majority cites the Supreme Court decision of *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

> "This Court finds that the district court was not clearly erroneous when it found under the *Arlington Heights* sensitivity inquiry that these plaintiffs had alleged and demonstrated a personal, palpable, discriminatory injury clearly resulting from the illegal actions, in some cases inaction, of the County Board."

Majority opinion at 1073. The majority's reliance upon *Arlington Heights* to support its findings of "palpable, discriminatory injury" is misplaced. *Arlington Heights* involved the denial of a rezoning petition for a *specific project* to build low and moderate income housing, and *all* of the plaintiffs' allegations and proof related to that

project. Such a fact situation is clearly contrary and thus distinguishable from the case at bar since in the present case there are no allegations, much less proof, of any proposed housing which was denied a zoning variance or special use permit and into which the plaintiffs could and would in fact "probably move."

This very distinction was recognized and emphasized by the Supreme Court in *Warth.* The Court in that case distinguished its decision from those cases which acknowledged the standing of low and moderate income plaintiffs to challenge exclusionary zoning practices. As was true in *Arlington Heights,* the distinguished cases involved challenged zoning restrictions ·as applied to *specific projects.* In addition, the plaintiffs in those cases established that unless relief was granted, their "immediate and personal interests would be harmed." 422 U.S. at 507, 95 S.Ct. at 2209. The *Warth* Court concluded that the cited cases *were not controlling* because the petitioners were only able to assert a "remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief." 422 U.S. at 507, 95 S.Ct. at 2209. There is no language in the *Arlington Heights* opinion that justifies any deviation from the Supreme Court's clear and unequivocal holding, set forth in *Warth,* that a plaintiff demonstrate a "particularized personal interest" before he can establish standing. Therefore, the majority's reliance on the *Arlington Heights* opinion is ill-conceived and misplaced for the very reason that the plaintiffs in this case, as was true in *Warth,* have not · and cannot allege (1) that any particular project was denied a zoning variance or a special use permit, and (2) that they themselves would specifically benefit from the grant of the relief sought, and thus have failed to establish the requisite "particularized personal interest."

At this juncture, it is incumbent upon me to briefly discuss what I consider irrelevant evidence cited by the majority (note that some of this evidence has been previously referred to in this dissent). For example,

on page 1067 of its opinion, the majority refers to statements made by Mr. James H. Clark, the collector and treasurer of DuPage County, to the *Chicago Tribune.* On the following page, reference is made to statements of Gerald R. Weeks, a member of the County Board, concerning the NAACP's need to comply with county zoning laws before it would be welcome to build in DuPage County. Then on page 1067, the majority refers to a statement made by Fred Koebeman, a member of the County Board and Zoning Committee, who when asked at a public hearing whether he favored the proposed NAACP project replied flatly "no." Finally, on page 1069, the majority cites the statement made by County Board member Ruth Kretchmer that the County Board would only approve the Glendale Heights project if there was "overwhelming" support from the community for the project. Note that the majority directly and/or indirectly refers to all of the above-mentioned statements in its discussion of standing on pages 1072 and 1073.

It is incomprehensible how any of the previously mentioned statements are relevant to the majority's determination that the DuPage County Board engaged in any activity which fairly can be said to have caused the individual plaintiffs injury—a necessary predicate to a finding of standing. In order for these statements to be relevant, they must be imputable to the County Board. The majority is certainly cognizant of the law in Illinois that no single board member has the power to bind a county board in the absence of specific authority granted by the board. *County of Stephenson v. Bradley and Bradley, Inc.,* 2 Ill.App.3d 421, 275 N.E.2d 675 (1971).

"A county board alone has power by law to bind a county contract, and there is no such power in an individual or a committee unless that power has been bestowed by the county board, *Sexton v. County of Cook,* (1885) 114 Ill. 174, 179, 28 N.E. 608. County Supervisors, including the Chairman of the Board have no power to act individually. *It is only when convened*

*and acting together as a board of supervisors that they represent and bind the county by their acts."*

*Id.,* 275 N.E.2d at 677–78 (emphasis added).[4] Thus, statements made by individual members outside the confines of a formal board meeting do not and cannot bind the Board, and are simply irrelevant to the determination of whether the Board is engaging in discriminatory activity. By definition, a board acts in its official capacity only through a majority of its members at a formal meeting. Thus, the only time individual members' outside statements are relevant to the preceding determination is when such statements are authorized *by the Board.* No such allegation or showing of authorization has been made. Note, that if the individual Board members' outside statements are irrelevant, *a fortiori,* statements made by nonmembers, such as those of Mr. James Clark which appeared in the *Chicago Tribune,* are irrelevant.

I would also like to air my concern that the majority may be encouraging the infringement of the First Amendment right to freely express opinions on political questions by imputing unauthorized statements, made outside of an official Board meeting, to the County Board as a whole. If Mr. Clark's statements to the *Chicago Tribune,* for example, can be used against the County Board as a whole, are we not giving the County Board an incentive to attempt to repress such statements by county officials in the future? When a First Amendment right is in danger of infringement, it merits concern, thought and serious reflection, especially when the speech in question involves an issue of public interest. I question whether the majority has given adequate consideration to this most important constitutional right of free speech so cherished in a democracy such as ours.

Finally, the majority attempts to bolster its unjustified conclusion with respect to the standing of the individual plaintiffs by making a quick reference to the fact that the County Board failed to utilize some $10,275,000 of HUD Block Grants available for promotion of low and moderate income housing. *See* majority opinion at 1073–1074. It should be recognized that no constitutional right exists which obligates a political entity to provide adequate housing.

"[T]here is no constitutional or statutory right for individual citizens to have housing meeting a particular standard, nor is there a concomitant duty on the part of political entities to provide housing. *Lindsey v. Normet,* 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972)."

*Smith v. Town of Clarkton, N.C.,* 682 F.2d 1055, 1068 (4th Cir.1982). The Fourteenth Amendment requires the County to afford proposals for low and moderate income housing equal treatment under the law, but it does not mandate the provision of "adequate" housing for all low and moderate income persons who may desire it. Therefore, the refusal to accept or use the Block Grant funds is irrelevant to the determination of whether or not the plaintiffs suffered any particularized injury.

I now turn to the question of the plaintiff, HOPE, Inc.'s standing. In its representative capacity, HOPE can only obtain standing if the individual plaintiffs it represents have standing. *Warth,* 422 U.S. at 516, 95 S.Ct. at 2214. Since my preceding analysis indicates that individual plaintiffs

---

4. *See also County of Will v. George,* 103 Ill. App.3d 1016, 59 Ill.Dec. 264, 431 N.E.2d 765 (1982). The Illinois statute granting power to the county board provides as follows:

"302. By whom corporate powers exercised § 23. The powers of the county as a body corporate or politic, shall be exercised by a county board, to wit: In counties under township organization (except the County of Cook), by the board of supervisors, which shall be composed of the town and such other supervisors as are or may be elected pursuant to law, until the first Monday in May, 1972, and, commencing with that date, shall be composed of the county board members elected under 'An Act relating to the composition and election of county boards in certain counties', enacted by the 76th General Assembly; in the County of Cook, by a board of county commissioners, pursuant to section 7, article 10 of the constitution; in counties not under township organization, by the board of county commissioners."

Ill.Ann.Stat. ch. 34 § 302 (Smith-Hurd Supp. 1983) (footnote omitted).

are without standing, HOPE does not have standing in its capacity as their representative.

HOPE also argues that it has standing in its own right based on an alleged injury to its corporate purpose of finding housing for low and moderate income persons in DuPage County. The complete absence of allegations concerning a denial of a particular project for low and moderate income housing, however, prevents HOPE, Inc. from showing that its inability to locate low and moderate income housing is in "any concretely demonstrable way," *Warth,* 422 U.S. at 504, 95 S.Ct. at 2208, the result of activity on the part of the DuPage County Board. Thus, under the *Warth* mandate, HOPE, Inc. has failed to establish standing in its own right.

The majority disagrees. It makes an unconvincing attempt to justify its position by citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). That decision, however, is distinguishable for the same reason that *Arlington Heights* was distinguishable from the case at bar. In *Havens Realty Corp. v. Coleman,* the defendants allegedly engaged in "racial steering" in violation of § 804 of the Fair Housing Act of 1968, 42 U.S.C. § 3604.[5] The complaint alleged specific instances in which the defendant, Havens Realty Corp., had told black apartment hunters that it had no apartments available while indicating to white apartment hunters that it did have apartments available. *See Havens,* 455 U.S. at 368, 102 S.Ct. at 1118. Thus, *Havens* involved *specific and particular discriminatory activity* which violated the plaintiffs' rights. It therefore should be apparent that the majority's reliance on *Havens* is as ill-conceived and misplaced as its reliance on *Arlington Heights.* The very problem with the plaintiffs' allegations in the present case (both the individual plaintiffs and HOPE) is that

they failed to allege specific and particular discriminatory acts such as the denial of zoning variations or special use permits for low and moderate income housing projects. Thus, HOPE, Inc. has failed to show the demonstrable injury to its organizational purpose necessary in order to satisfy Article III standing requirements since it has been unable to point to any particular act or acts by the County Board which *caused* its injuries.

I, along with my brethren, refuse to condone injustice. Included in my definition of injustice is discrimination against minorities and the poor. I do not, however, believe it is within my realm of authority, as a federal appellate judge, to force my personal views on a defendant when the plaintiff has failed to allege a case which meets even the minimum constitutional requirements. I have arrived at this position based on my belief that I must first ensure that the constitutional requirements set down by our founding fathers are met *before any* judicial power is exercised. Quoting from the Supreme Court decision in *Valley Forge,* as I did at the outset of this dissent:

> "Article III, which is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated . . . ."

*Valley Forge,* 454 U.S. at 476, 102 S.Ct. at 760.

It appears to me that the majority is violating the Constitution as interpreted by the Supreme Court. They are attempting to achieve what they conceive as a desirable social result in DuPage County while ignoring the mandates of the Supreme Court and the requirements of the United States Constitution. It must be recognized that the

---

5. Racial steering, as defined by the plaintiffs in *Havens,* is a "practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups." 455 U.S. at 366 n. 1, 102 S.Ct. at 1118 n. 1.

"Constitution does not provide judicial remedies for every social and economic ill." *Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972). Furthermore, it is not within the power of this appellate court to ignore the requirements of the Constitution, even if we feel a social evil has occurred.

Because none of the plaintiffs in the present action meet the minimum constitutional requirements for standing, as set forth by the United States Supreme Court in *Warth v. Seldin,* the remaining issues raised by the defendants should not have been reached by the majority. Based on the plaintiffs' lack of standing, I would reverse the district court's decision and dissolve the injunction imposed by that court. Therefore, I respectfully dissent.