

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-22-2000

# Alexander v RIGA

Precedential or Non-Precedential:

Docket 98-3597 and 98-3622

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Alexander v RIGA" (2000). *2000 Decisions.* Paper 63.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/63

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 22, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-3597 and 98-3622

RONALD ALEXANDER; FAYE ALEXANDER;
FAIR HOUSING PARTNERSHIP OF GREATER
PITTSBURGH, INC.,
Appellants in No. 98-3597

v.

JOSEPH RIGA; MARIA A. RIGA a/k/a Carla Agnotti

RONALD ALEXANDER; FAYE ALEXANDER;
FAIR HOUSING PARTNERSHIP OF GREATER
PITTSBURGH, INC.,

v.

JOSEPH RIGA; MARIA A. RIGA a/k/a Carla Agnotti

JOSEPH RIGA and MARIA A. RIGA,
        Appellants in No. 98-3622

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. No. 96-cv-00049)
District Judge: Honorable William L. Standish

Argued
October 18, 1999

Before: SLOVITER, MANSMANN and ROTH,
Circuit Judges.

(Filed March 22, 2000)


        Timothy P. O'Brien, Esquire
        Mitchell, O'Brien & Kakoff
        429 Forbes Avenue
        1705 Allegheny Building
        Pittsburgh, PA 15219

        Caroline Mitchell, Esquire (ARGUED)
        707 Grant Street
        3700 Gulf Tower
        Pittsburgh, PA 15219

       Counsel for Ronald Alexander,
     Faye Alexander, and Fair Housing
     Partnership of Greater Pittsburgh

     Thomas M. Hardiman, Esquire
      (ARGUED)
     Joseph P. McHugh, Esquire
     Reed, Smith, Shaw & McClay
     435 Sixth Avenue
     Pittsburgh, PA 15219-1886

      Counsel for Joseph Riga and
     Maria Riga

     Rebecca K. Troth, Esquire (ARGUED)
     United States Department of Justice
     Civil Rights Division
     P.O. Box 66078
     Washington, DC 20035-6078

      Counsel for Amicus Curiae --
     United States of America

     Charles S. Ralston, Esquire
     NAACP Legal Defense & Educational
      Fund
     99 Hudson Street
     16th Floor
     New York, NY 10013

      Counsel for Amicus-Appellant

2

OPINION OF THE COURT

MANSMANN, Circuit Judge.

The present case arises essentially as an appeal by the plaintiffs Ronald and Faye Alexander ("the Alexanders") and the Fair Housing Partnership of Greater Pittsburgh, Inc. ("the FHP") from a judgment entered in the United States District Court for the Western District of Pennsylvania.1 The Alexanders and the FHP brought suit against Joseph and Maria Riga ("the Rigas"), the owners of the building in the Squirrel Hill neighborhood of Pittsburgh in which the Alexanders sought to rent an apartment. In their suit, the Alexanders and the FHP alleged racial discrimination in the rental of housing pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. S3601 et seq., and the Civil Rights Act of 1866, as amended, 42 U.S.C. SS1981 and 1982. In their complaint, the Alexanders and the FHP sought damages, as well as equitable and injunctive relief.

Following an eight-day trial in the District Court, the jury found, on special verdicts, that Mrs. Riga had violated the Fair Housing Act when she denied rental housing to the Alexanders based upon race. Nonetheless, the jury found Mrs. Riga's conduct was not "a legal cause of harm" to the Alexanders and did not award damages. The jury found that Mrs. Riga's conduct was "a legal cause of harm" to the FHP, but, likewise, did not award damages. Thus, the District Court declined to submit to the jury the issue of punitive damages, which had been bifurcated from the liability portion of the case. Following post-trial motions, the District Court entered judgment in favor of the Rigas (the defendants) and the FHP, and against the Alexanders, and directed the parties to bear their own costs.

On appeal, the Alexanders (the plaintiffs), supported by the NAACP Legal Defense & Educational Fund and the United States Department of Justice as amici curiae, raise

_____

1. The Rigas, in a cross-appeal, assert that the District Court erred in denying them summary judgment, in excluding evidence, and in denying them costs.

a host of issues related principally to the jury instructions and the conduct of the trial. We have jurisdiction to review the District Court's final judgment pursuant to 28 U.S.C. S 1291.

Because we find that in a case alleging discrimination under the Fair Housing Act the discrimination itself is the harm, we will reverse the decision of the District Court granting judgment to the Rigas as against the Alexanders and the decision declining to submit the question of punitive damages to the jury. We will direct the District Court on remand to enter judgment for the Alexanders and to hold a new trial to present to a jury the question of punitive damages, as against both Mr. and Mrs. Riga.

I.

From September 17, 1995, through October 8, 1995, on ten separate occasions, Ronald and/or Faye Alexander, an African-American couple, inquired about an apartment at 5839 Darlington Road, Squirrel Hill, which had been advertised in a September 17 newspaper. Joseph and Maria Riga owned the building, which Mrs. Riga managed. Mrs. Riga falsely told the Alexanders that the apartment was unavailable and the Alexanders were denied a view. Their phone calls to inquire about the apartment were not

returned. Daria Mitchell, an African-American "tester" for the FHP, was falsely told that the apartment had been rented, and thereafter, Mrs. Riga refused to return Mitchell's calls.

In contrast, from September 18 through October 9, 1995, on ten separate occasions, Mrs. Riga truthfully told Dennis Orvosh, a white tester for the FHP, and whites Robin McDonough, Jeff Lang, and Heidi Sestrich, that the apartment was available, allowed each a view, and returned their phone calls.

On January 11, 1996, the Alexanders and the FHP filed this civil action against the Rigas. In their complaint, the plaintiffs sought damages, as well as equitable and injunctive relief, for alleged race discrimination. Specifically, the plaintiffs alleged that the Rigas discriminated against the individual plaintiffs on the basis of their race in

violation of the Fair Housing Act in connection with the attempts of Mr. and Mrs. Alexander to view a rental property owned by the Rigas in Squirrel Hill. The Fair Housing Act prohibits discrimination in the sale or rental of housing, including the refusal to negotiate for the rental of, or otherwise make unavailable or deny, a dwelling to any person because of race; to discriminate against any person in the terms, conditions or privileges of rental of a dwelling because of race; or to represent to any person because of race that any dwelling is not available for inspection, sale or rental when such dwelling is, in fact, available. See 42 U.S.C. SS 3604(a), (b) and (d). The plaintiffs sought equitable relief including an order requiring the posting of fair housing notices and a cease and desist order prohibiting the Rigas from discriminating on the basis of race.

Following an eight-day trial in May, 1998, a jury returned eight special verdicts. The jury found that Mrs. Riga had discriminated against the Alexanders in violation of the Fair Housing Act. Nonetheless, the jury found that the discriminatory conduct of Mrs. Riga was not "a legal cause of harm" to either Mr. or Mrs. Alexander, and declined to award them monetary damages.[2] As to the FHP, the jury found that the discriminatory conduct of Mrs. Riga was "a legal cause of harm" to the FHP, however, here, too, the jury declined to award monetary damages. The issue of punitive damages had been bifurcated from the issues of liability and compensatory and/or nominal damages. After the return of the jury's special verdicts, the court declined to submit the issue of punitive damages to the jury. Based on the special verdicts, the District Court entered judgment

in favor of the Rigas and against the plaintiffs, together with costs, on May 26, 1988.

On May 28, 1998, the plaintiffs filed four post-trial
_____

2. Although both Mr. and Mrs. Riga were defendants at trial, the special verdicts that were submitted to the jury were limited to determining Mrs. Riga's liability for discriminatory conduct. The District Court concluded, mistakenly, as discussed infra, that only Mrs. Riga was involved in the events leading to this lawsuit because Mr. Riga was in Italy at all relevant times.

motions: (1) to enter a judgment notwithstanding the verdict, to issue an additur of nominal damages in the amount of one dollar for each plaintiff, or to grant a new trial on damages, or in the alternative, award punitive damages as a matter of law against both Mr. and Mrs. Riga; (2) for a hearing on injunctive relief; (3) for attorney's fees, costs and expenses; and (4) to grant the plaintiffs judgment as a matter of law. The Rigas moved to tax costs against the plaintiffs.

On October 13, 1998, the District Court denied the plaintiffs' motions except for the FHP's motion to have judgment entered in its favor, denied the Rigas' motion to tax costs, and entered judgment. The plaintiffsfiled a timely notice of appeal on November 5, 1998. The Rigas also filed a timely cross-appeal.

On appeal, the plaintiffs put forth several major contentions. They assert that the District Court should have entered judgment for them because the jury charges presented an incorrect legal standard with respect to liability. The plaintiffs further maintain that the District Court presented an incorrect legal standard with respect to nominal damages and erred in refusing to submit the issue of punitive damages to the jury after the jury found that Mrs. Riga had discriminated on the basis of race in violation of the Fair Housing Act but awarded neither compensatory nor nominal damages. The plaintiffs argue, too, that both Mr. and Mrs. Riga should be subjected to punitive damages, because, although Mr. Riga was out of the country at this time, he violated a nondelegable duty not to discriminate under the Fair Housing Act.

II.

The Fair Housing Act was intended by Congress to have "broad remedial intent." Havens Realty v. Coleman, 455 U.S. 363, 380 (1982). As this case stands after trial, the net

result of the plaintiffs' victory was that they were out-of-pocket for the expenses of litigation. Historically, enforcement of the civil rights statutes depends, in large measure, on the willingness of private plaintiffs to pursue individual cases. The Supreme Court has attached

importance to each individual's prosecution of discrimination under the statutes:

> the objectives of the [discrimination statutes] are furthered when even a single [individual] establishes that [another individual] has discriminated against him or her. The disclosure through litigation of incidents and practices that violate national policies respecting nondiscrimination . . . is itself important.

McKennon v. Nashville Banner Pub., 513 U.S. 352, 358 – 59 (1992). And, with respect to the Fair Housing Act in particular, the Supreme Court has held that

> since the enormity of the task of assuring fair housing makes the role of the [United States] Attorney General in the matter minimal, the main generating force must be private suits in which . . . the complainants act not only on their own behalf but also "as private attorneys general in vindicating a policy that Congress considered to be of the highest priority."

Trafficante v. Metropolitan Life Ins., 409 U.S. 205, 211 (1972).

III.

A. The Alleged Errors in the Jury Instructions

The Alexanders argue on appeal that, after the jury's verdict that the Fair Housing Act was violated, the District Court was required to enter judgment in favor of them and the FHP.3 All plaintiffs allege on appeal primarily two flaws in the District Court's jury instructions. The plaintiffs specifically argue that the District Court erred: (1) in requiring that the jury find "legal causation" for "harm" as a prerequisite to finding liability under the Fair Housing Act, and (2) in requiring that the jury find "insubstantial" actual damages or "legal harm" as a prerequisite to awarding nominal damages.

_____

3. Ultimately, the District Court did grant judgment in the FHP's favor, but did not award any damages.

Unfortunately, a party who has not challenged the trial court's jury instructions at an appropriate time is deemed to have waived such a challenge. We have emphasized the need to raise any objections to jury instructions prior to the time the jury begins its deliberations:

> Under Fed. R. Civ. P. 51, a party, in order to preserve an objection either to a failure to instruct the jury on an issue or to the manner in which the jury was instructed, clearly must "object[ ] thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." See also, McAdam v. Dean Witter Reynolds, 896 F.2d 750, 759 (3d Cir. 1990) (declining to consider newly developed argument concerning jury charge deficiency where party "failed to specifically and clearly object to either the charge or the entry of a judgment . . . based on this charge"); Waldorf v. Shuta, 896 F.2d 723, 739–40 (3d Cir. 1990) (holding that objection, because sufficiently specific, had preserved error alleged on appeal).

Simmons v. Philadelphia, 947 F.2d 1042, 1078 (3d Cir. 1990), cert. denied, 503 U.S. 985 (1992). Generally, a party who does not clearly and specifically object to a charge he believes to be erroneous waives the issue on appeal. Id.

If the party claiming error in the jury instructions did not make a timely objection, we review for plain error and we will reverse only if the trial court committed plain error that was fundamental and highly prejudicial, such that the instructions failed to provide the jury with adequate guidance, and the District Court's refusal to consider the issue would result in a miscarriage of justice. Cooper Distrib'g v. Amana Refrig.,180 F.3d 542, 549 – 550 (3d Cir. 1999). Fed. R. Civ. P. 51. We have characterized plain error review in the absence of a "timely and specific objection," as "a form of discretionary review that we have exercised sparingly . . . ." Id., see also Bowley v. Stotler, 751 F.2d 641, 652 (3d Cir. 1985); see also United States v. 564.54 Acres of Land, 576 F.2d 983, 987 (3d Cir. 1978) (under plain error doctrine, court may review jury instruction if error is "fundamental and highly prejudicial" and failure to

consider it "would result in a miscarriage of justice"), rev'd on other grounds, 441 U.S. 506 (1979).

In short, our discretion to conduct a review under the

plain error doctrine is limited to cases where the error is (1) fundamental and highly prejudicial or if the instructions are such that the jury is without adequate guidance on a fundamental question and (2) our failure to consider the error would result in a miscarriage of justice. 564.54 Acres of Land at 576 F.2d at 987 – 988. Consistent with our belief that this discretionary power should be exercised sparingly, we will review the purported deficiencies in the jury instructions to determine whether they have been properly preserved and constitute grounds either for reversing the District Court's decision or for a new trial. The issue of whether a jury instruction misstates the proper legal standard is subject to plenary review. Hopp v. Pittsburgh, 194 F.3d 434, 440 (3d Cir. 1999).

1. The Alleged Error on Liability

The plaintiffs assert that the District Court's liability instruction was inaccurate and misleading and might have caused the jury not to award any damages despite their finding of a Fair Housing Act violation. Though the jury found that Mrs. Riga had discriminated against the Alexanders, the jury found that there was no liability. The Alexanders did not receive a liability verdict because they were unable to prove "causation." On the other hand, the FHP did receive a liability verdict; the jury found that there was "legal cause" as to the FHP caused by Mrs. Riga's discriminatory acts.

This is a statutory form of action. The Fair Housing Act provides that "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . to obtain appropriate relief with respect to such discriminatory housing practice or breach."4 42 U.S.C.

_____

4. The FHP, a fair housing organization, is an "aggrieved person" under the statute and is entitled to obtain relief, including punitive damages.

9

S3613(a)(1)(a). The Fair Housing Act defines"discriminatory housing practice," in pertinent part, as follows:

> (a) To refuse to sell or rent after the making  of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

***

    (d) To represent to any person because of race, color,
    religion, sex, handicap, familial status, or national
    origin that any dwelling is not available for inspection,
    sale, or rental when such dwelling is in fact so
    available.

42 U.S.C. S3604.5 The plain language of the Fair Housing
Act thus permits an individual to obtain relief for the
discriminatory housing practice or breach. A prospective
tenant must prove only that a landlord did one of the
unlawful acts listed in section 3604 with respect to the
prospective tenant's attempt to obtain housing. If an
individual proves discrimination, he or she need not prove
anything else. The District Court imposed upon the statute
another requirement, "legal causation." The Rigas argue
that the discrimination is the "legal cause" for the "harm,"
which itself must be proved. To the contrary, the"harm" is
the discrimination.

_____

See Havens Realty, 455 U.S. at 379 (1982); See also Growth Horizons v.
Delaware County, 983 F.2d 1277, 1281–82 (3rd Cir. 1993); See also
Hope, Inc. v. DuPage County, 717 F.2d 1061, 1074 (7th Cir. 1983). On
appeal, the Rigas have challenged the FHP's standing in this case. We
note that the Supreme Court has held that a fair housing organization
had standing to sue if the discriminatory acts impaired the
organization's ability to carry out its mission. Havens Realty, 455 U.S.
at

378 – 379. Here, the FHP staff "stopped everything else" and devoted all
attention to this case. It, moreover, diverted resources to investigate
and

to counter the Rigas' conduct.

5. In conjunction with the Fair Housing Act "Definitions" at 42 U.S.C.
S3602.

10

The Alexanders felt themselves to be the victims of
housing discrimination and sued the Rigas under the Fair
Housing Act, both to vindicate their unlawful treatment and
the public interest in fair housing. One "unlawful act" of
several which falls under the ambit of section 3604 is that
the Alexanders were told that the apartment was not
available, when it was. The statute directly focuses on that
situation, seeks to deter it, and seeks to remedy it. At trial,
the Alexanders related what transpired during their
housing search and also described additional adverse
consequences, such as emotional distress, for which they
sought compensatory damages. Although the jury declined

to award compensatory damages for any adverse consequences flowing from the discrimination, the jury believed that the Alexanders were indeed victims of illegal discrimination.

We conclude that the District Court misstated the proper legal standard in this Fair Housing Act case by requiring "legal causation" beyond a showing of illegal discrimination. Nonetheless, we find that the plaintiffs did not make a timely objection to the jury charge on this issue and have so waived it. The plaintiffs did not object to this requirement of "legal causation" at the close of the jury instructions. Moreover, the attorneys for both plaintiffs had previously participated in a charge conference in which they met with the judge and agreed upon instructions.

Under a plain error analysis, unquestionably, the instructions requiring "legal causation" failed to provide the jury with adequate guidance as to compensatory damages.6 See Tyus v. Urban Search Management, 102 F.3d 256, 265(7th Cir. 1997)(instruction "confusing" where jury charged that one element of a Fair Housing Act violation is

_____

6. The Rigas urge that our holding in Gunby v. Pennsylvania Elec., 840 F.2d 1108, 1121 – 1122 (3d Cir. 1988), cert. denied, 492 U.S. 905 (1989) mandates that, to determine liability in a Fair Housing Act case, a jury find "causation" linked to "actual injury." Gunby is inapplicable here. In Gunby, the plaintiff did not present evidence that he suffered any emotional distress as a result of the loss of the sought-after job. Thus, we set aside the jury's award of compensatory damages for emotional distress, holding that emotional distress cannot be presumed and that speculative damages are not to be awarded.

11

proof that the discriminatory housing practice caused "actual injury"), cert. denied, 520 U.S. 1251 (1997). The second criterion for plain error, however, is that our refusal to consider the issue would result in a miscarriage of justice.

The plaintiffs have conceded that they did not make a claim for substantial compensatory damages. Further, we cannot say, in light of our decision taken as a whole, which should afford substantial relief to the plaintiffs, see B. The Assignment of Judgment, infra, that our refusal to consider the issue of compensatory damages would result in a miscarriage of justice.

2. The Alleged Error on Nominal Damages

The plaintiffs further argue that the jury was improperly

instructed and that the jury committed error when it failed to return an award of $1 in nominal damages for Mrs. Riga's violation of the Fair Housing Act. The plaintiffs allege that the District Court erred in instructing the jury that an award of nominal damages requires a finding of "insubstantial" actual damages, or of "legal harm."[7] Rather, the plaintiffs contend that nominal damages should be awarded where the jury has found a federal civil rights violation, particularly the "fundamental" right to fair housing. Thus, the jury should have been instructed that it was required to find nominal damages if it found, as it did, that housing discrimination had occurred and the jury should have acted in conformity with that instruction and awarded the plaintiffs these damages.

The District Court apparently felt that this case involved "merely" a violation of "purely statutory rights," and that, therefore, nominal damages were not required. In our opinion, this stance trivializes the role of civil rights law in eradicating discrimination. Racial discrimination, according

---

7. Notably, plaintiffs did object after the jury charge to the District Court's special verdict questions charging that the jury find "legal harm" and "legal cause" and proposed that the special verdict ask only whether "harm" was caused. The District Court refused, stating, ". . . My instructions are clear."

to the Supreme Court, is a "fundamental injury to the individual rights of a person," Goodman v. Lukens Steel, 482 U.S. 656, 661 (1987), and the inability to buy or lease real property can be considered one of the badges and incidents of slavery. See also The Civil Rights Cases, 109 U.S. 3, 22 – 23 (1883). Indeed, even absent proof of actual injury, nominal damages are to be awarded to recognize violation of a constitutional right. Carey v. Piphus, 435 U.S. 247, 266 –67 (1978).

This entitlement is not automatic, however, "but rather, it is incumbent upon the plaintiff to make a timely request for nominal damages." Campos-Orrego v. Rivera , 175 F.3d 89 (1st Cir. 1999). In this instance, the plaintiffs requested and received an instruction on nominal damages, but failed to bring to the District Court's attention their contention that the jury should have been instructed that nominal damages are mandatory with a finding of discrimination. The plaintiffs neglected to bring this matter to the attention of the trial judge prior to the time the jury retired to consider its verdict, much less the specific grounds upon which it was based. In an attempt to avoid a holding that this failure to object to the jury instructions waived their

right to challenge the jury's nominal damages verdict on appeal, the plaintiffs argue that the District Court's failure here was plain error.

Without deciding the question, we find that even if the jury were without adequate guidance on the question of whether nominal damages are mandatory or discretionary for violation of a federal statute, failure to rectify this error under the specific circumstances of this case does not result in a miscarriage of justice. In the final analysis, given our holding in this case, the plaintiffs are the prevailing parties, have the opportunity to recover punitive damages, and might each only receive $1 less in compensation than that to which it might be entitled. See 564.4 Acres of Land, 576 F.2d at 988 (failure to rectify error could result in miscarriage of justice because one party could receive several million dollars less in compensation than that to which it was entitled). Thus, we hold that the plaintiffs' failure to challenge the jury instruction dealing with nominal damages waived their right to raise this question on appeal.

B. The Assignment of Judgment

On a crucial and related matter, we find that because the jury found that the Fair Housing Act was violated, the District Court was required, as a matter of law, to enter judgment for both the Alexanders and the FHP. The District Court's refusal to enter judgment for the Alexanders constitutes an abuse of discretion, and we will reverse.8 Similarly, the District Court abused its discretion in failing to find that both the Alexanders and the FHP were "prevailing parties" and entitled to costs under 42 U.S.C. S 3613(c)(2). See New Jersey Coalition of Rooming & Boarding House Owners v. Mayor of Asbury Park, 152 F.3d 217, 225 (3d Cir. 1998)(the Fair Housing Act's costs "provision, which sounds fully discretionary. . .--`the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and costs'--actually is not. In fact, a district court's discretion not to grant attorney's fees and costs in civil rights cases is tightly cabined.") We therefore hold that both the Alexanders and the FHP were prevailing parties and will direct the District Court to award them attorneys' fees and costs on remand.

C. Punitive Damages

1. Conduct Calling for Punitive Damages

In this case, the District Court declined to send the issue of punitive damages to the jury. One main reason for this

appears to have been that because the jury awarded no
actual damages to either plaintiff, the District Court
concluded that Mrs. Riga was not liable to the Alexanders.
Because so much of the Rigas' brief was devoted to this

_____

8. Without deciding the waiver issue as to declaratory relief for the
Alexanders, on this one point regarding final judgment, we are satisfied
that even were there a waiver, the matter would be one of plain error.
Entering judgment for the party found by the jury to have violated the
Fair Housing Act, rather than for the victims who had been
discriminated against, is a paradigmatic "miscarriage of justice." And,
further, this improper assignment of judgment led to sequelae which are
anathema to public policy, such as denial of costs to the victims for
successfully proving a Fair Housing Act violation.

14

issue, though later they conceded the point, it bears
mentioning that beyond a doubt, punitive damages can be
awarded in a civil rights case where a jury finds a
constitutional violation, even when the jury has not
awarded compensatory or nominal damages. See Curtis v.
Loether, 415 U.S. 189 (1974) (punitive damages appropriate
for Title VIII violation without award for actual loss,
remanding for jury trial on punitive damages amount), see
also Basista v. Weir, 340 F.2d 74, 87 (3d Cir.
1965)(punitive damages appropriate in section 1983 case
absent award of compensatory damages).

We have sufficiently resolved this matter in our foregoing
discussion on the jury charge regarding liability, and in our
conclusion that a Fair Housing Act violation is all that is
needed to establish liability. Another reason the District
Court declined to send the issue of punitive damages to the
jury is that the District Court concluded that the jury
apparently did not believe Mrs. Riga's conduct to have
resulted from the type of evil motive thought necessary to
award punitive damages. We will address this second point.

Whether there is sufficient evidence to support a punitive
damages award is a question of law which we review de
novo. Delli Santi v. CNA Ins., 88 F.3d 192, 207 (3d Cir.
1996), Bonjorno v. Kaiser Aluminum & Chem., 752 F.2d
802, 814-15 (3d Cir. 1984), cert. denied, 477 U.S. 908
(1986).

Here, there is a specific damages provision in the plain
language of the statute. 42 U.S.C. S3613(c) provides the
relief which may be granted, when, as here, private
individuals seek to enforce the Fair Housing Act:

        (1) In a civil action under subsection (a) of this  section,

> if the court finds that a discriminatory housing practice has occurred . . . , the court may award to the plaintiff actual and punitive damages, and . . . may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

15

> (2) In a civil action under subsection (a) of this section, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs.

> *   *   *

The District Court has the duty to "give effect, if possible, to every clause and word of [the] statute." Bennett v. Spear, 520 U.S. 54 (1997).

The standard for punitive damages in a federal civil rights action was set by the Supreme Court, and does not require "outrageousness": a jury may "assess punitive damages in [a civil rights action] when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade , 461 U.S. 30, 56 (1983).

In denying the Alexanders' request to submit the punitive damages issue to the jury, the District Court found that punitive damages were precluded because the jury's refusal to award damages showed that the jury, in the District Court's words, "did not consider the conduct of Mrs. Riga to have been the result of an evil motive or intent or to have involved reckless or callous indifference to the federally protected rights of others." In the District Court's view, it thus "would be inappropriate to permit the jury to award punitive damages to them." The District Court also held that more than intentional discrimination is required for the jury to enter punitive damages -- that "outrageous conduct on the part of Mrs. Riga beyond that which may attach to any finding of intentional discrimination" was required.

"Malice" and "reckless indifference," in this context, however, refer not to the egregiousness of the landlord's conduct, but rather to the landlord's knowledge that it may be acting in violation of federal law. See Kolstad v. American Dental Association, 527 U.S. 526, ___, 119 S.Ct. 2118, 2124 (1999). In Kolstad, a female employee sued her employer

under Title VII, asserting that the employer's decision to promote a male employee over her was a proscribed act of gender discrimination. The District Court denied the

16

employee's request for a jury instruction on punitive damages. The Court of Appeals affirmed, holding that, before the jury can be instructed on punitive damages, the evidence must demonstrate that the defendant has engaged in some "egregious" misconduct; under the facts of that case, the female employee had failed to make the requisite showing. The Supreme Court vacated the earlier decision and remanded. In so doing, the Supreme Court explicitly rejected the conclusion that "eligibility for punitive damages can only be described in terms of [a defendant's] `egregious' misconduct." Rather, the Supreme Court held that"[t]he terms `malice' and `reckless' ultimately focus on the actor's state of mind," making a showing of egregious or outrageous discrimination unnecessary. Id. Applied to the case before us, we hold that because the jury'sfinding of a violation under the Fair Housing Act necessarily encompasses a finding of intentional discrimination, the plaintiffs need not also demonstrate that the conduct was particularly egregious or malicious in order to obtain punitive damages.

Indeed, recklessness and malice may be inferred when a manager responsible for showing and renting apartments repeatedly refuses to deal with African-Americans about the apartment, and misrepresents the apartment's availability. See Miller v. Apartments & Homes, 646 F.2d 101 (3d Cir. 1981) ( punitive damages appropriate where defendant acts with reckless disregard as to whether he is violating a federally protected right, or consciously and deliberately disregards consequences of actions), see also Woods-Drake v. Lundy, 667 F.2d 1198 (5th Cir. 1982) ("wilful and gross" violation of the Fair Housing Act supported punitive damages where landlord evicted tenants for having African-American guests; on remand, trial court directed to assess punitive damages).

In the case before us, the jury returned special verdicts finding the rights of the Alexanders and the FHP testers under the Fair Housing Act to have been violated. The Alexanders and the FHP presented evidence that Mrs. Riga persistently refused to deal with African-Americans, as opposed to whites, and represented that an apartment was not available for inspection or rental, when it was. The

17

Alexanders described in saddening detail the deceptions to which they were subjected, and the consequent mortification they suffered. Mrs. Riga told them that "they had just missed" the apartment listed in an advertisement on Sunday, the day before. When the same advertisement appeared the following Sunday, Mr. Alexander asked a friend to call. The friend was told that the apartment was available. Using a different name, Mr. Alexander arranged to see the apartment and called twice to confirm the appointment. When he met Mrs. Riga at the building, she falsely stated that she had forgotten her keys, and could not show him the apartment, as her hand covered up her keys. Mr. Alexander "couldn't believe it, it made him angry," he thought she was lying. When he asked to reschedule, Mrs. Riga said that he could call her. He was feeling "a little bit too sick to say anything else . . . ." He walked away, then turned and saw her entering the building. He called to reschedule and left messages, but did not receive a responding telephone call from Mrs. Riga. After this, Mr. Alexander sought the assistance of the FHP, which directed testers to seek the apartment. In short, the white testers were granted access while the African-Americans testers were denied access. Mr. Alexander continued to try to contact Mrs. Riga and also had friends call. To one friend he remarked that he felt "hurt and discouraged, it is sort of degrading, it discourages you from trying . . . tofind a place for your family to live, it is just sickening, I really can't describe it. It is terrible . . . ."

The Supreme Court in Kolstad did observe that the mere existence of a civil rights violation is not a guarantee of eligibility for punitive damages because a defendant might not be aware of the federal law he or she violated or he or she might have honestly believed that the discrimination was permissible. Kolstad, 119 S. Ct. at 2125. These exceptions, however, do not apply to the Rigas in this case. Here, there is not any suggestion that Mrs. Riga did not know that it was illegal, and had been for thirty years, to discriminate on the basis of race in housing. The jury concluded that Mrs. Riga refused to deal with African-Americans with respect to the apartment building and was motivated by race. The plaintiffs have adduced sufficient evidence to demonstrate "reckless or callous indifference" to

18

federally protected rights and to permit the jury to award punitive damages.

2. Mr. Riga's Liability for Punitive Damages

Although both Mr. and Mrs. Riga were defendants at trial, the special verdicts that were submitted to the jury

were limited to determining Mrs. Riga's liability for discriminatory conduct. The District Court concluded that only Mrs. Riga was involved in the events leading to this lawsuit because Mr. Riga was in Italy at all relevant times. The Rigas assert that excluding Mr. Riga from the punitive damages discussion was appropriate because he neither had the requisite personal involvement nor did he acquiesce in Mrs. Riga's discriminatory conduct. The plaintiffs argue that both Mr. and Mrs. Riga should be subject to punitive damages, because, though Mr. Riga was out of the country at the relevant time, he violated a nondelegable duty not to discriminate under the Fair Housing Act.

Of course, a principal is directly liable where he himself commits, authorizes, or ratifies discriminatory treatment, see Miller, 646 F.2d at 111 ($25,000 punitive damages award against principal for agent's action, where principal was involved in wrongdoing or authorized, ratified, or fostered agent's discriminatory acts); see also Asbury v. Brougham, 866 F.2d 1276 (10th Cir. 1989) (owner of management company and agent who refused to rent both liable; punitive damages against owner sustained). We now must decide, as a matter of first impression, whether a principal is vicariously liable for punitive damages for violations of the Fair Housing Act by the discriminatory acts of his managerial agent.

The Rigas contend that Mrs. Riga's conduct cannot be attributed to Mr. Riga. They are mistaken. Mr. Riga could not insulate himself from liability for discrimination in regard to an apartment building owned jointly by him and his wife and managed for their joint benefit, merely by relinquishing the responsibility for preventing discrimination to Mrs. Riga, his managerial agent. To effectuate the Fair Housing Act's mandate, both Mr. and

19

Mrs. Riga are held responsible for Mrs. Riga's discriminatory practices. Here we adopt the general rule applied by other federal courts that the duty of a landlord under the Fair Housing Act not to discriminate in the leasing of property may not be delegated to the landlord's employee. Civil Rights Act of 1968, S801 et seq., 42 U.S.C. S3601 et seq. See Walker v. Crigler, 976 F.2d 900, 904 & n. 5 (4th Cir. 1992)("the duty of a property owner not to discriminate in the leasing or sale of that property is non-delegable"), see also Marr v. Rife, 503 F.2d 735, 741 (6th Cir. 1974) ("The discriminatory conduct of an apartment manager or rental agent is, as a general rule, attributable to the owner and property manager of the apartment complex, both under the doctrine of respondeat superior

and because the duty to obey the law is non-delegable."), Coates v. Bechtel, 811 F.2d 1045, 1051 (7th Cir. 1987); Phiffer v. Proud Parrot Motor Hotel, 648 F.2d 548, 552 (9th Cir. 1980); Saunders v. General Services, 659 F.Supp. 1042, 1059 (E.D.Va. 1987) ("Under the Fair Housing Act, a corporation and its officers `are responsible for the acts of a subordinate employee . . . even though these acts were neither directed nor authorized . . . .' Courts have followed this rule even where `it seems harsh to punish innocent and well-intentioned employers' because the statutory duty not to discriminate is non-delegable") (citations omitted).

On policy grounds, in Kolstad the Supreme Court arguably modified one aspect of this general rule, which could produce the harsh result that even a landlord who had made every effort to prevent discrimination could nevertheless be subject to punitive damages. Kolstad, 119 S. Ct. at 2128. Cf. Walker, 976 F.2d at 904-905 (property owner liable for the conduct of employees despite instructions to them not to discriminate). Recognizing civil rights law as an effort to promote prevention as well as remediation and observing the principles underlying the Restatement's limits on vicarious liability for punitive damages,9 the Supreme Court held that, "in the punitive

_____

9. The Restatement (Second) of Agency, among other things, authorizes punitive damages "against a . . . principal because of an [agent's] act .
.
.
if . . . the agent was employed in a managerial capacity and was acting

20

damages context, an employer could not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's `good-faith efforts to comply with[civil rights laws].' " Kolstad, 119 S.Ct. at 2118, 2121, 2128. The Supreme Court continued that "[g]iving punitive damages protection to employers who make good-faith efforts to prevent discrimination . . . accomplishes [the civil rights laws'] objective of `motivat[ing] employers to detect and deter [civil rights] violations.' " Id. (internal citations omitted).

We conclude, therefore, that the issue of Mr. Riga's liability should be submitted to the jury. While Mr. Riga may have been abroad at the time of the suit, he apparently left Mrs. Riga in charge of the apartment building with authority to act on behalf of the two of them as a couple. At this juncture, we do not know if Mr. Riga made "good faith efforts to prevent discrimination," defined to an extent

by the Supreme Court as efforts to "deter and detect [civil rights] violations" and to "enforce an anti-discrimination policy." Id. at 2129-2130. We leave to the jury on remand to determine whether Mr. Riga engaged in active anti-discrimination efforts sufficient to protect him from the impact of the general rule that he may not delegate to Mrs. Riga the duty not to discriminate.

## D. Injunctive Relief

On appeal, the plaintiffs also argue that because the jury returned special verdicts finding that Mrs. Riga had violated the Fair Housing Act through a continuing course of refusal to deal with African-Americans, the District Court should have granted injunctive relief, not only to safeguard the rights of these plaintiffs, but also on a policy level to

_____

in the scope of employment," and affirms that even intentional, specifically forbidden torts are within this scope if the conduct is "the kind [the employee] is employed to perform," "occurs substantially within the authorized time and space limits," and "is actuated, at least in part, by a purpose to serve" the employer. Restatement (Second) of Agency SS217 C(c), 228(1), 230, cmt. b. (1958).

21

safeguard free access to housing. The District Court denied the plaintiffs' request to present evidence on the need for injunctive relief, asserting that the plaintiffs had waived the request, because, although it had been a significant portion of the complaint and pretrial statement, the plaintiffs had not repeated the request until six days after the jury trial. The District Court also found that even had the plaintiffs not waived the request, there was no need for injunctive relief because there was not any evidence of a continuing or recurrent violation.

The Rigas suggest that the plaintiffs sought injunctive relief primarily to allow them to recover their attorneys' fees, but stated the issue as, "whether [within the court's discretion] declaratory and injunctive relief is necessary." Of course, the Rigas assert that this Court should defer to the District Court's judgment that it was unnecessary; evidence had been presented that the Rigas had rented apartments to African-Americans since the events of the Alexanders' lawsuit. Were we to examine the issue of injunctive relief on the merits, we would accord the District Court substantial deference on this matter, under the applicable abuse of discretion standard. Marco v. Accent Publ'g, 969 F.2d 1547, 1548 (3d Cir. 1992) (denial of injunctive relief reviewed for abuse of discretion, which occurs if the District Court's decision rests on a clearly erroneous finding of fact, an

error of law, or a misapplication of law to the facts). This deference is not absolute, however, and we would need to be mindful that deterrence and prevention of future discrimination, one of the central purposes of the civil rights statutes, McKennon, 513 U.S. at 358, might require the entry of injunctive relief. We are troubled to an extent by the District Court's rationale, which might permit the Rigas and other civil rights defendants to discriminate and stop when caught, in enough time to "obviate" the need for a court to issue injunctive relief.

Regardless of the interesting nature of this issue, however, we will hold, as did the District Court, that the issue has been waived. Here, six days elapsed from the time the jury's verdicts were returned and the jury was discharged, until the plaintiffs requested a hearing on injunctive relief. Though the District Court conceded that

22

the plaintiffs had requested this relief in their complaint and pretrial statements, "at no time during the pretrial conferences with the court, or during the trial itself, did plaintiffs' attorneys refer to their requests for injunctive and equitable relief." We agree with the District Court that the issue is waived by the failure of counsel to raise the issue of injunctive relief prior to the conclusion of trial. In addition, through the remand we direct in this opinion, we are satisfied that, to some extent, the policy goal of deterring future discrimination will be effected.

E. Evidentiary Matters

In light of our decision, the remainder of the issues raised by both parties are either mooted or left to reconsideration on the limited remand we now grant. We comment here only briefly on two remaining evidentiary matters: (1) the plaintiffs' claim that the District Court abused its discretion by excluding evidence of the Rigas' discrimination against other African-Americans, and (2) the Rigas' claim on cross-appeal that the District Court abused its discretion by excluding evidence of the Alexanders' lack of creditworthiness and lack of credibility. We find that in neither instance did the District Court abuse its discretion.

The plaintiffs maintain that the District Court erred in excluding probative evidence of the Rigas' ongoing pattern of discrimination in the form of an eyewitness, Steven Denson, who allegedly observed Mrs. Riga discriminating against other African-American applicants. The plaintiffs state that the witness' address was only discovered during the trial, because the Rigas' counsel had refused to supply it upon request. Further, the plaintiffs assert that were this

evidence permitted, the Rigas would suffer no surprise or prejudice, inasmuch as their counsel had interviewed the witness previously.

For their part, the Rigas dispute that they acted improperly with respect to this witness. The evidence's relevance was tenuous -- he might not even have been at the Darlington building. The District Court reasonably concluded that the probative value of the testimony was outweighed by its prejudicial impact.

23

Similarly, properly excluded was the evidence the Rigas proffered that the Alexanders were not creditworthy. Though the Rigas maintain that the Alexanders had to show that they were fully qualified to rent the apartment ultimately, the Alexanders only needed to show that they were qualified to be applicants, to view the apartment, and be treated no differently from other applicants. If this case were about the Alexanders' unsuccessful apartment application and they could make a prima facie showing of discrimination, then the evidence of creditworthiness would indeed be relevant. Under the facts with which we are presented, however, the evidence was not relevant, and the District Court properly excluded it. Finally, the Rigas claim that they should have been permitted to offer evidence of the Alexanders' untruthful statements on documents such as employment applications. The Rigas obviously sought to introduce this evidence to show conformity therewith. The District Court properly excluded this too, because it was evidence of other bad acts not admissible to prove the Alexanders' character under Fed. R. Evid. 404 and not within the exceptions outlined in Fed. R. Evid. 404(b).

IV.

We will reverse the decision of the District Court granting judgment to the Rigas as against the Alexanders and the decision declining to submit the question of punitive damages to the jury. We direct the District Court to enter judgment for the Alexanders, and for other declaratory relief consistent with our opinion, as well as costs, including reasonable attorney's fees, to the Alexanders and the FHP and to remand the case for a new trial solely to present to a jury the question of punitive damages as against both Mr. and Mrs. Riga.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit